STATE OF FLORIDA
COUNTY OF DADE
On this 23 day of SEPTEMBER, 20 23 I attest that the
preceding or attached document is a true, exact, complete, and unaltered
photocopy made by me of THIS FINAL ARBITRATION
AWARD (60 Pages INCLUDING COVER)
presented to me by the document's custodian R. NOTIS
and, to the best o my knowledge, that the photocopied document is neither
a vital record nor a public record, certified copies of which are available
from an official source other than a notary public.

NOTARY PUBLIC
STATE OF FLORIDA

CARLOS GONZALEZ
Commission # HH 265160
Expires May 15, 2026

*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלאריד&#1488;

*200 178ᵗʰ St., Sunny Isles Beach, FL 33160*

## PARTIES:

**SALOMON ALBERTO BTESH (hereinafter referred to as "Salomon")**

**Vs.**

**ISAAC ALBERTO BTESH (hereinafter referred to as "Isaac")**

**RAQUEL BTESH DE MICHAAN (hereinafter referred to as "Raquel")**

**YVONNE BTESH DE SNAIDER (hereinafter referred to as "Yvonne")**

## FINAL ARBITRATION AWARD

## INTRODUCTION:

Salomon Alberto Btesh, of 9801 East Broadview Dr., Bay Harbor Islands, FL 33154, brings this action against the Defendants:

1) Isaac Alberto Btesh, who resides at Condominio The Palace, Calle 46, Bella Vista, Panama City; and 20201 E. Country Club Dr. Unit 310, Miami, FL 33180;

2) Raquel Btesh De Michaan, residing at Edificio Tequendama, Calle Juan XXIII Apartamento 14, Punta Paitilla, Panama City;

3) Yvonne Btesh De Snaider, residing at Edificio Landmark, Calle Juan XXIII Punta Paitilla, Panama City;

before this *Beis Din* (Rabbinical Court), comprising three ordained Rabbis serving as an arbitration panel. The members of the *Beis Din* are Rabbi Avrohom E. Notis, Rabbi Moshe Yitzchok Bresler, and Rabbi David Markstein. All three arbitrators have been appointed for this matter by the Beis Din of Florida Inc.

## NOTICE TO RESPONDENTS:

Respondents were duly notified of the scheduled *Beis Din* sessions on three separate occasions. Notice was sent to their respective email addresses,

1) Isaac, IBTESH@REJOVOT.COM on June 12ᵗʰ, June 20ᵗʰ, & July 6ᵗʰ, 2023,

2) RMICHAAN@REJOVOT.COM on June 12ᵗʰ, June 20ᵗʰ, & July 6ᵗʰ, 2023, &

3) YVONNE@REJOVOT.COM on June 12ᵗʰ, June 20ᵗʰ, & July 6ᵗʰ, 2023.



1

*BEIS DIN OF FLORIDA*                                        בית דין צדק דמדינת פלארידא

*200 178ᵗʰ St., Sunny Isles Beach, FL 33160*

Physical copies of the summons were delivered by DHL to their physical addresses, on June 9ᵗʰ, June 21ˢᵗ, & July 10ᵗʰ, 2023 [EXHIBIT A]. However, the Respondents failed to attend the scheduled sessions or provide any response to the summonses.

## JURISDICTION OF THIS TRIBUNAL:

The parties involved entered into a financial agreement in Panama on January 22, 2020, referred to as the PANAMA AGREEMENT. An accompanying copy of this agreement is appended as Exhibit B. In accordance with the agreement's Paragraph 16, it states, "In the event of any difference or dispute as to the performance, interpretation, execution, and/or scope of this document, the parties submit exclusively to the alternative dispute resolution methods in effect for members of the Israeli Charitable Society *Shevet Ahim*, waiving any other recourse in any jurisdiction."

While this provision prevents any civil court in any jurisdiction from ruling on matters pertaining to the agreement's performance, interpretation, execution, or scope, it does not specify a particular arbitrator or arbitration panel. Rather, it establishes the specific means of settling all disputes - the alternative dispute resolution methods employed by *Shevet Ahim* members. This becomes the only viable avenue for the claimant to seek relief.

Given that *Shevet Ahim* identifies itself as an Orthodox Jewish Community, it is clear that the methodology referenced pertains to *Halacha*, as interpreted by Rabbinic literature throughout history. Halachic Law that concerns financial matters can only be adjudicated by a *Beis Din*, a tribunal composed of three ordained Rabbis versed in *Halacha*[1].

*Batei Din's* typical protocol involves dispatching up to three *Hazmanot* (summonses) to the defendant. This process allows the defendant either to accept the summons or suggest an alternative *Beis Din* in their local area. If the defendant ignores these summonses, under normal circumstances, the plaintiff would turn to the Civil Court system, which possesses the authority and tools to mandate the defendant's appearance. Yet, in this particular situation, due to the agreement signed by both parties, seeking legal action in any other jurisdiction is strictly off the table.

---

[1] *Shulchan Aruch Choshen Mishpat* 3:1

2





*BEIS DIN OF FLORIDA*                                                    בית דין צדק דמדינת פלארידא

*200 178ᵗʰ St., Sunny Isles Beach, FL 33160*

As a result, the plaintiff has no choice but to pursue the matter through a *Beis Din*, even if it entails an *ex-parte* hearing. In such cases, a decision given by the *Beis Din* is deemed halachically legitimate, akin to a default judgment one might obtain in a Civil Court system[2]. The jurisdiction under Halachic law resides with the *Beis Din* that issues the summonses[3].

The jurisdictional reach of this *Beis Din* introduces added layers of complexity. While initially it seems that its authority is limited only to topics directly mentioned in the Panama Agreement, a deeper analysis reveals associated issues inherent to the agreement that profoundly impact its specifics. Ignoring these foundational matters would make it unfeasible to make any conclusive judgment concerning the Panama Agreement. The *Beis Din* undeniably has jurisdiction over these deeper issues as well. This understanding aligns with the intention of the "scope" clause found in Paragraph 16 of the Panama Agreement.

Once the *Beis Din* has issued a ruling on the substance of the claims, the ruling may be filed in the Civil Court system to enforce the *Beis Din's* ruling[4]. Paragraph 16 of the Panama Agreement only precludes the Civil Court System from ruling on the essence of the claims of the Parties. It does not, however, in any manner prevent the Parties from implementing a *Beis Din*-issued ruling utilizing the court system.

## APPLICABLE LAW:

The legal framework applied by the *Beis Din* to resolve this dispute is the *Halacha*. *Halacha* is the collective body of Jewish religious laws and commandments derived from the *Torah* (the first five books of the Hebrew Bible) and the *Talmud*, as codified in the *Shulchan Aruch*. It serves as the fundamental legal and ethical framework guiding the religious practices and conduct of all Orthodox Jews. It is evident that the unequivocal intent of all signatories to the Panama Agreement was to adopt this framework, as well as this being the standard practice of ALL *Batei Din* (Rabbinical Courts), whose jurisdiction has been duly acknowledged and accepted by the Parties involved.

---

[2] Ibid 18:6, See also *Bach* 13:8, *Ketzos Hachoshen* 13:1 & *Tumim* 13:4.

[3] For additional reasons why this *Beis Din* has the jurisdiction see *Mabi"t* Vol. 2 Responsa 33.

[4] See *Maharsha"m* Vol. 1 Responsa 89 & *Igros Moshe Choshen Mishpat* Vol. 2 Responsa 10.



*BEIS DIN OF FLORIDA*  בית דין צדק דמדינת פלאריד״א

200 178th St., Sunny Isles Beach, FL 33160

## GENERAL BACKGROUND

The *Beis Din* carefully examined numerous documents, emails, public news articles, and other materials. From our comprehensive review of these sources, we have arrived at the following understanding.

Mr. Alberto Btesh was a successful businessman living in Panama, until his passing on December 17, 2019, at the age of 97. He was one of the wealthiest men in Panama at the time. Most of his wealth was concentrated in his 55% ownership of Multibank, which was sold soon after his death to Banco de Bogotá / Grupo Aval. The sale closed during the first quarter of 2020.

The value of Alberto Btesh's ownership percentage of the Multibank shares at the time of his death was approximately $228 Million USD.

Alberto Btesh fathered four (4) children, two male children, Salomon and Isaac, and two daughters, Raquel and Yvonne.

According to an MRI and three (3) different medical analysis reports, one of them by the Cleveland Clinic of Miami, Alberto Btesh suffered from advanced dementia at the time of his death on December 17, 2019. However, according to those medical records, dementia commenced as early as 2012. His dementia is documented on his death certificate.

On Nov 19th, 2019 a Multibank resolution was publicized, announcing the transfer of Alberto's shares in the bank to Isaac, Joyvon (Yvonne), & Raquel. This indicates the transfer was signed a short time prior. According to Salomon, he was informed by Rabbi Doron Miara, a Rabbi of the *Shevet Ahim* community, that Alberto transferred the bank shares to Isaac, Joyvon (Yvonne), & Raquel in mid-2019. At the time of the transfer, Mr. Alberto Btesh was suffering from advanced dementia. According to the housekeeper who saw Alberto Btesh each day, he could not even recognize his own children.

Salomon Btesh (the Petitioner) was not notified, nor consulted regarding the transfer of the Multibank shares.

In 2020, a few months following Alberto Btesh's death, the Multibank shares were sold to Grupo Aval / Banco de Bogotá, for $428 Million USD.





*BEIS DIN OF FLORIDA*                 בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

In 2015, Fundación Aryisa was established.  It divided Mr. Alberto Btesh's assets, mostly cash and real estate, valued at approximately $80MM. The Multibank shares, constituting the greatest asset owned by Albert Btesh, were NOT included in the Fundación. Ultimately, under the terms of the Panama Agreement, Isaac Btesh directed the Fundación to distribute $10 Million USD to Mr. Salomon Btesh. These funds were duly paid to Salomon in Florida, between February 28th and March 4th, 2020.

In January 2020, an Agreement was signed by all four siblings in which Mr. Salomon Btesh would receive $28 Million USD, $10MM from the funds held by Fundacion Aryisa, which were paid to Salomon in Florida, and an additional $18 Million USD as his share in the funds received from the Multibank sale, which to date has not been paid. The Agreement further provided for Arbitration before a Rabbinical body "in the event of any difference or dispute as to the performance, interpretation, execution and/or scope of this document".

Thereafter attempts were made to negotiate in good faith however no agreement was reached and the matter remains unresolved.

## CLAIMANT'S ALLEGATIONS:

THE PETITIONER SALOMON BTESH MAKES THE FOLLOWING CLAIMS;

Petitioner's Father, Alberto Btesh, died on December 17th, 2019, leaving an estate worth $308.25MM. Most of his estate was comprised of his 55% ownership of Multibank, whose value at the time was approximately $228.25 Million USD. This is besides for the approximately $80 Million USD held by Fundacion Aryisa.

According to Jewish law, in the absence of a Halachically recognized will, any inheritance is to be divided equally between the male children, in this case between Petitioner and his brother Isacc Btesh, at 50% each.

The petitioner contends that his trio of siblings (comprising a brother and two sisters) wrongfully took away his rightful inheritance. At the point of his demise, Alberto was 97 years of age and grappling with severe dementia. Three medical documents, submitted by reputable professionals, confirm his dementia diagnosis since 2014 and detail his consistent mental decline. These medical experts include Dr. Edisa Pitti, a renowned psychiatrist from Panama, Doctor Dondis affiliated with Centro Medico



*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

Paitilla, and Dr. Salzman associated with the Cleveland Clinic in Miami. The term "detirioro cognitive mayor" is prominently noted on his death certificate.

Petitioner has provided medical reports purporting to prove that his father, Alberto Btesh, suffered from advanced dementia at the time his property was obtained by Respondents. A few months after signing the agreement, Petitioner received medical data, including a hospital MRI, revealing that his father had been suffering from advanced dementia for at least five (5) years before his death. Three medical professionals diagnosed severe dementia in written reports.

Alberto Btesh was provided with complex documents and told to sign them, signing over his Multibank shares in mid-2019, while suffering from Major Cognitive Impairment. At the time he signed the documents he was mentally incapacitated. In fact, according to an affidavit given by the housekeeper who attended to Alberto Btesh each day, he did not even recognize his children.

The petitioner alleges that his siblings engaged in an intricate plot to deceitfully transfer the Multibank shares belonging to their father, during a period when he was evidently unfit to make such significant choices. These unlawfully obtained shares were subsequently sold to Banco de Bogotá/Grupo Aval in the early months of 2020. Throughout this process, the petitioner was neither informed nor sought for consultation.

In January 2020, one month after Alberto Btesh's death, a written Agreement was entered into between Petitioner and his siblings (the Respondents), whereby Petitioner was to receive $28MM. At the time of the Agreement, Petitioner was unaware of most of the facts, including how and when the Multibank shares had been transferred. Petitioner agreed that in the event of non-payment, dispute, or need for interpretation, a Rabbinical tribunal would act to Arbitrate the problem. The agreed-upon sum was never paid by the Respondents. Petitioner was duped into accepting that amount as the fraud perpetrated by Respondents was not yet revealed.

The Petitioner recognizes that had the transfer of shares occurred when his father's mental competence was beyond question, he would have had no grounds to dispute the share transfer. The fact that he was unaware of the timing of this transfer is the precise reason he consented to sign the Panama Agreement. However, he alleges that only after signing the Agreement did he learn that the Respondents had their father, Alberto Btesh, sign documents just before his death. This was a time when Alberto was not in a mental condition to properly execute such a transfer due to advanced dementia. As a result, the Petitioner was entirely deprived of his inheritance.





*BEIS DIN OF FLORIDA*                                         בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

Despite their agreement to arbitrate in a Rabbinical forum, the Respondents have failed to appear at any Beis Din to resolve matters under Halacha law. Documentation has been provided demonstrating that the Respondents have been notified to appear. The Respondents have been summoned and notified numerous times. Emails prove the Respondents' acknowledgment of notice and their intentional refusal to abide.

The Petitioner claims he is entitled to Fifty Percent (50%) of the value of Albero's shares of the bank, which amounts to $114MM, plus a reasonable rate of interest since December 17, 2019, plus legal fees and costs expended, in accordance with Halacha.

Additionally, Plaintiff claims $750,000 USD to be paid to his wife, Deborah. This consists of a $250,000 USD payment for each of their 3 unmarried daughters, to be held by Deborah in trust until each one marries, at which time the payment will be given to the marrying daughter. This payment is detailed in the Fundacion Aryisa bylaws.

## RESPONDENTS' ALLEGATIONS:

Even though the respondents have not put forth any allegations, made any claims, or even responded to the claimant's assertions, their silence and absence of response are significantly telling.

## LEGAL AND FACTUAL ANALYSIS OF TRIBUNAL:

The Panama Agreement addresses two key components: the allocation of assets within the ARYISA Foundation, and the shares held in MULTIBANK. Both elements were part of Salomon Alberto Btesh's estate upon his passing. According to Aryisa Funancion's governing documents, Salomon was entitled to $10MM, with an additional $750,000 USD allocated to his wife, Deborah Btesh, to hold in trust for their daughters until their marriage. These allocations were determined by the Fundacion Aryisa's rules and are reiterated in Paragraph 2 of the Panama Agreement. The plaintiff alleges that while the $10MM was received, the $750,000 USD was not.

The primary issue relevant to this arbitration, however, pertains to the Multibank shares' aspect of the Panama Agreement. As per Paragraphs 4-8 of the Panama Agreement, Salomon was to receive $15.25MM from the sales' proceeds, payable within 15 days after the other parties involved in the

7



*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלאָרידא

*200 178th St., Sunny Isles Beach, FL 33610*

agreement received their respective payouts from the sale. Issac Btesh was to donate an extra $3MM on behalf of Isaac Chama and/or Moussa Chama to charities chosen by Salomon in honor of Alberto's soul as a *"maaser"* (more accurately *"chomesh"*) payment of Salomon's portion. As a condition for these payments, Salomon was required to irrevocably renounce any potential claims against Isaac, Yvonne, Joyvon, Raquel, Arysia, Alberto's Estate, Multi Financial Group, Multibank, among others, and waive any benefits from the Multi Financial Group shares' sale.

The plaintiff alleges that despite the sale of the bank in March 2020 and subsequent disbursement of funds to Isaac, Raquel, and Joyvon, he has not received the due amount of $18.25MM. This nonpayment is the primary reason for this arbitration. The Beis Din has the authority, under paragraph 16 of the Panama Agreement, specifically the "scope" clause in the aforementioned Paragraph 16, to pass judgment on all of Plaintiff's claims.

To provide some context, the Panama Agreement was signed on January 22nd, 2020, in Panama. It came into existence shortly after the details of the Fundacion Aryisa, which substituted Alberto's Will, were revealed. The Fundacion documents only covered the other, less significant assets of Alberto's inheritance, leaving out Alberto's main asset: his shares in Multibank. When inquiring about the status of the Multibank shares, Salomon learned that Alberto did not own the shares at the time of his death. Instead, they had been transferred to Isaac, Raquel, & Yvonne. This troubling information led the Claimant to sign the Panama Agreement. Upon further investigation into the timing of the transfer of the bank shares and Alberto's mental state at that time, Plaintiff now argues that he was deceived into signing the agreement, thus rendering its obligations void. Additionally, the Defendants' failure to meet their scheduled payments casts further doubt on the Agreement's current validity.

Halachic standards draw a distinct line between transferring ownership of an item currently in one's possession and renouncing rights to something one has not yet acquired but has rights to. To transfer ownership, a *Kinyan* is necessary – a symbolic act indicating a definitive and irreversible agreement to shift ownership[5]. However, to give up rights to something not yet in one's possession, like outstanding debts, a *Kinyan* is not required[6]. A simple *mechilah* [literally "forgiveness"] will suffice.

Upon careful examination of the Panama Agreement, it is evident that no *Kinyan* transpired. Indeed, the very language of the Agreement [see Paragraph 8] is synonymous with *mechilah*. Accordingly, the very first issue requiring verification is whether Claimant was in possession of a portion of the bank

---

[5] *Shulchan Aruch Choshen Mishpat* 189:1
[6] Ibid 12:8



*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלאריידא

*200 178th St., Sunny Isles Beach, FL 33160*

shares at the time the Panama Agreement was signed, or whether he had no ownership, rather only a claim to acquire them.

In order to resolve this key point, an analysis must be made of the ownership of the multibank shares at the moment of Alberto's death on Dec 17th, 2019. Alberto Btesh founded Gran Financiera in 1968, eventually developing into Multicredit Bank upon receiving a banking license in 1988, becoming Multibank in 2008. Despite selling off minority shares to other Companies, as well as gifting shares to family and friends, Alberto was always the majority stakeholder in the Bank. Up until the months prior to his death, he retained full ownership in this 55%, not putting it into any other trust or foundation. We are not in possession of any documentation transferring ownership of the shares, however, we have reviewed an official notification by the Panamanian Authorities dated November 19th, 2019 that Alberto's shares had been transferred to Defendants Isaac, Raquel, and Joyvon (Yvonne). This indicates that in a short time period prior to the date of the aforementioned notification, Alberto had transferred his shares in Multibank to Isaac, Raquel, and Joyvon (Yvonne). This is additionally supported by a report provided by Salomon, outlining a series of discussions between him and Rabbi Doron Miara, one of the Rabbis associated with *Shevet Ahim*. These conversations were aimed at facilitating negotiations for a resolution between the claimant and the defendants, and they culminated in the creation of the Panama Agreement. According to Salomon's recollection, in the course of these discussions, Rabbi Doron consistently alluded to the transfer of shares from Alberto to the defendants that took place in the middle of 2019. Salomon asserts that Rabbi Doron described this transfer as having been "kosher," stating explicitly that his active involvement had ensured its legitimacy. Efforts were undertaken by a different *Beis Din* to have Rabbi Doron provide testimony regarding the events surrounding the transfer, yet the Rabbi declined to attend and give his account before the *Beis Din*[7].

The next issue to clarify is Alberto's state of mind in the timeframe when the shares were transferred and as a result the Halachic standing of any such transfer.  It has been shown beyond any doubt by the

---

[7] It is questionable whether or not Rabbi Doron is believed that he actively participated in the transfer of shares, based upon the well-known Halachic Rule of *Ein Adam Meisim Atzmo Rasha*, a person is not believed to self-incriminate himself by saying that he performed an action which would deem him a *Rasha*. *Shulchan Aruch Choshen Mishpat* 282:1 states that the Sages frown upon someone who acts as a witness to the transfer of inheritance from one brother to another. While that would presumably not suffice for one doing so to be considered a *Rasha*, see however *Knesset Hagdolah* glosses on *Tur* 282 note 3 and *Maharna"ch* responsa 118 who upgrade the transgression to an actual violation of either Biblical or Rabbinic law (see *Sdei Chemed, Klalim, Klal* 3), which would then deem an active witness to such a transaction a *Rasha*, in which case Rabbi Doron's claims to have actively participated in the purported share transfer, which, if valid, would be a violation of Halachic principles, cannot be believed as he cannot self-incriminate himself. If, however, the share transfer is not valid, he would then be believed.

*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

Claimant that Alberto was suffering from advanced dementia in the last years of his life. Reports from 3 separate respected medical professionals attest to that, as does the testimony from Alberto's housekeeper and nurse. The Halachic rule regarding someone suffering from mind-altering maladies is clear. "One who is not of sound mind, his acquisitions are not valid, nor are his sales. A gift bequeathed by him is invalid[8]". Therefore, the purported transfer of Alberto's shares to Defendants has no validity whatsoever. In fact, it would appear that the share transfer was only effectuated to allow the sale of the bank to proceed, as Alberto's signature on the sale at that time would have been worthless.

An additional significant detail is a transcribed conversation recorded on November 6th, 2019, between Salomon and Alberto, which the *Beis Din* has documented. In this conversation, Alberto tells Salomon that the bank has been sold, but the payment is still pending. Once the payment is received, it will be directed to Alberto, since the shares are his. Salomon will then get his rightful portion of the proceeds. Though this cannot be considered definitive proof due to Alberto's dementia diagnosis, it certainly provides evidence that considering Alberto's mental state at that moment, the legitimacy of the share transfer is highly questionable.

In that case, Alberto is considered to have been the owner of the 55% stake in Multibank at the time of his death on December 17<sup>th,</sup> 2019. As a result, at the moment of Alberto's passing, Claimant inherited his portion of Alberto's holding in Multibank, which in turn would necessitate a *Kinyan* rather than a *mechilah* in the Panama Agreement. Seeing as a *Kinyan* was not performed, Salomon is not in any way obligated to waive his claims to Alberto's shares in Multibank.

What portion of Alberto's holding in Multibank does Claimant inherit? "What is the order of inheritance? When a person dies his son inherits him. In the event his son predeceased him, if the deceased son has any offspring, male or female, the son's offspring inherit in place of the son. If the son has no progeny, the inheritance is transferred to the deceased's daughter(s)[9]". If there are no sons (or their issue), the estate is passed to the daughters. Daughters do not receive any inheritance if there are sons[10]. When male offspring exist, they are invariably the exclusive heirs of their father's estate. The Torah awards women no rights of inheritance as long as there are male heirs in the same class. (Daughters do not inherit if there are sons, nor sisters if there are brothers)[11]. The Sages were generally

---

[8] *Shulchan Aruch* ibid 235:20
[9] Ibid 276:1
[10] Estate planning, wills, & Halacha V4 (Marburger) chapter 1.
[11] Dick https://www.jlaw.com/Articles/last_will_and_testament1.html





*BEIS DIN OF FLORIDA*                             בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

not in favor of any disinheritance or diminution of inheritance among one's children, even in favor of one child who is a Torah scholar over another who does not conduct himself properly, and they counseled against participation in any such disposition of assets[12]. It is forbidden to circumvent the Order of Inheritance by disinheriting a halachic heir. When the Torah defines the order of inheritance, it teaches us the proper distribution of an estate. The *Torah's* Order of Inheritance is not just a default for those who neglect to execute a will; rather, it reflects the Torah's view of how an estate should be divided. Therefore, executing a will that overrides this Order by disinheriting a halachic heir is prohibited. Nevertheless, the will would be valid even though it violates *halachah*. This concept is expressed in a fascinating ruling quoted by *Rema*[13]: A woman gave an executor a bag of gold and instructed her executor to distribute it 'in the best manner'. The *Mordechai*[14] rules that we do not distribute the money to charity. Rather, we distribute the assets to the halachic heirs in accordance with the Halachic Order of Inheritance. Thus, following the *Torah's* instructions on how to distribute an estate is considered the ideal allocation of the estate[15]. This applies in cases where the deceased passes away intestate. This rule is also applied where the deceased has written a will, to any assets not included in the will. Throughout the generations, in a nod to societal changes, efforts have been made to find a Halachically viable mechanism to circumvent the letter of the law. "There are several halachic methods available whereby one may distribute a significant part of his estate according to his wishes, as long as a certain percentage of it is distributed according to the Torah's laws of inheritance[16]". The most prevalent among these methods is putting assets into a trust or foundation. This would explain the glaringly apparent problem in this case, which is why were the bank shares not included in Fundacion Aryisa? It is assumed that Alberto, in accordance with Halachic requirements, left that portion of his estate to be distributed according to the Torah's Order of Inheritance. The outcome of the above reasoning would be that Salomon inherited 50% of Alberto's 55% stake in Multibank's shares.

## TRIBUNAL'S FINDINGS:

1) 1) Per the provisions delineated in the Fundacion Aryisa's bylaws [EXHIBIT C], there is a clear arbitration clause. It dictates that any disputes concerning the Fundacion, including its assets, revenues, bylaws, or charter, should be referred to the Arbitration Committee of the Sociedad

---

[12] Ibid.
[13] Glosses to *Shulchan Aruch* 282:1
[14] *Bava Basra* 265.
[15] Marburger chapter 2.
[16] Neustadt https://torah.org/torah-portion/weekly-halacha-5771-shoftim/





*BEIS DIN OF FLORIDA*                                                    בית דין צדק דמדינת פלאריד״א

200 178ᵗʰ St., Sunny Isles Beach, FL 33160

Israelitade Benefincencia Shevet Ahim. This is starkly different from the wording in the Panama Agreement, where there is no reference to any "Arbitration Committee." Instead, it details the procedural approach used by the members of *Shevet Ahim*, namely Halacha. Even if one were to entertain the Claimant's position that an Arbitration Committee within *Shevet Ahim* is currently non-existent, this *Beis Din* opines that due to the explicit choice of an arbitration panel—regardless of its existence at the time the Fundacion was founded—it remains challenging for any *Beis Din* to assert its authority. As such, this Arbitration Panel opts not to claim jurisdiction and, therefore, refrains from adjudicating on the Plaintiff's grievances concerning the assets overseen by Fundacion Aryisa[17].

2) Based upon the evidence submitted, specifically paragraph 16 of the Panama Agreement, this *Beis Din* finds that;
   A. We hold jurisdiction over ALL matters pertaining to the Panama agreement. This encompasses not only the explicit details and provisions of the agreement but also any background issues that influence its implementation, bar those included in the Fundacion Aryisa, and is thereby authorized to render the following ruling, AND
   B. Any ruling must be based on accepted Halachic practices, AND
   C. The ensuing award falls within the scope of the Parties' agreement to resolve disputes through arbitration;

---

[17] It is of importance to address the Halachic perspective of Plaintiff's distrust of the Rabbis of *Shevet Ahim*. Rem"a in *Shulchan Aruch Choshen Mishpat* 14:1 states A wealthy individual who is known as an influential person, in his home town, is taken out to be tried in another city, even though the Court of Law in his home town is more eminent. *Benjamin Ze'eb s. 418 — G. all fear him and are partial towards him. Cf. supra n. 15 and § 13, n. 27 end. This applies equally whether he is the plaintiff or the defendant and despite the fact that the members of the local Court are very learned, — for we apprehend that because of his influential position they will not render an impartial verdict. However, if he is not a powerful person but is only highly respected in his city on account of his wealth or wisdom and his fellow-litigant demands to be tried in another city, then it depends upon the discretion of the Judges, viz., that if they really feel that they might be partial towards him, he may be compelled to attend Court in another city; if not, they try him here — P.Tesh., A.H.* In this instance, with Isaac Btesh having served twice as the President of *Shevet Ahim*, it is indisputable that he is wealthy, influential, and powerful and as a result Halacha would disqualify any Rabbis of Shevet Ahim from adjudicating issues involving Isaac Btesh. The fact that the Rabbis of *Shevet Ahim* have themselves been summoned to appear before various *Batei Din* to explain their part in this sordid issue and have rebutted all efforts to have them appear, culminating in a *Seruv* against a number of them [EXHIBIT H] only serves as reinforcement of the narrative that these Rabbis are hopelessly corrupted serving the needs of their twice president, Isaac Btesh.



*BEIS DIN OF FLORIDA*



ביח דין צדק דמדינת פלאירידא

*200 178th St., Sunny Isles Beach, FL 33160*

3) Additionally, based on medical reports from Dr. Edisa Pitti, Doctor David Dondis, and Dr. Damon Salzman [EXHIBIT D], along with sworn affidavits from Rosangel Rivero Guerrero, who served as Alberto's housekeeper [EXHIBIT E], and Jorge Calderon Ludena [EXHIBIT F], who served as Alberto's nurse, it is evident that Alberto Btesh suffered from advanced-stage vascular dementia during the last few months of his life, rendering him entirely incapable of making any effective decisions. This is further backed up by the cause of death on Alberto's death certificate [EXHIBIT G].

4) Although we cannot ascertain the precise date of the transfer of Multibank's shares to the Defendants, the registration of the transfer by the Panamanian Authorities on November 19, 2019, serves as evidence that the transfer took place in the months leading up to November 2019, at a time when Alberto was unquestionably suffering from advanced dementia. Rosangel Rivero Guerrero's testimony about a meeting involving Alberto Btesh, Isaac Btesh, and two attorneys during her nine-month employment as Alberto's nurse until his passing further reinforces this fact, as does Claimant's reported conversation with Rabbi Doron Miara of *Shevet Ahim* noted above.

5) According to the information provided, it is evident that the transfer of shares in Multibank from Alberto Btesh to the Defendants is entirely void. Consequently, Alberto retained ownership of the aforementioned Multibank shares until his passing on December 17th, 2019, at which point his Halachic heirs, Salomon & Isaac jointly inherited those shares.

## TRIBUNAL'S DECISIONS AND RULINGS:

NOW THEREFORE IT HAS BEEN DECIDED AS FOLLOWS:

1) PETITIONER'S CLAIM IS GRANTED. DEFENDANT ISAAC BTESH IS ORDERED TO PAY CLAIMANT SALOMON BTESH THE AMOUNT OF $134,950,000 USD WITHIN 10 DAYS OF THE SIGNING OF THIS AWARD.

2) THE BREAKDOWN OF THE AMOUNT ABOVE IS AS FOLLOWS: A) $114M IS THE VALUE OF 50% OF ALBERTO'S SHARES AT THE TIME HIS DEATH. B) $20,900,000 USD AS A



*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

SUPPLEMENTARY PAYMENT FOR HAVING INVESTED AND PROFITED FROM CLAIMANTS FUNDS OVER A PERIOD OF 44 MONTHS SINCE ALBERTO'S PASSING ON DEC 19TH 2019. IT IS IMPORTANT TO CLARIFY THAT THIS DIRECTIVE SHOULD NOT BE INTERPRETED AS INVOLVING INTEREST ON A MONETARY OBLIGATION, AS THIS WOULD CONTRAVENE THE PROHIBITION AGAINST RECEIVING INTEREST. INSTEAD, IT SHOULD BE REGARDED AS A BASELINE MEASURE OF THE MINIMUM PROCEEDS THAT THE CLAIMANT'S FUNDS HAVE YIELDED FROM DECEMBER 17TH, 2019, UP TO THE PRESENT DATE, & C) $50,000 USD AS LEGAL FEES.

3) PLAINTIFF AND DEFENDANTS ISAAC, RAQUEL, & YVONNE ARE HEREBY OBLIGATED TO FORWARD A COPY OF THIS RULING VIA DHL TO GERARDO HERNANDEZ CORREA, VP LEGAL, BANCO DE BOGOTA, #7-47 CALLE 36, PISO 13, BOGOTA D.C. COLOMBIA, & ALFREDO BOTTA ESPINOSA, VP INTERNATIONAL AND TREASURY, BANCO DE BOGOTA, #7-47 CALLE 36, PISO 13, BOGOTA D.C. COLOMBIA, WITHIN 14 DAYS OF RECEIPT OF THIS RULING.

Signed, stamped, and sealed in Sunny Isles Beach, Florida on the 8th day of September, 2023. Signatures on the attached signature page.



*BEIS DIN OF FLORIDA*



בית דין צדק דמדינת פלארידא

*200 178th St., Sunny Isles Beach, FL 33160*

## TO THIS RULING WE HEREBY ATTACH OUR SIGNATURES:

**RABBI AVRAHAM E. NOTIS**          **RABBI DAVID MARKSTEIN**          **RABBI MOSHE Y. BRESLER**

**TELEPHONE: (786) 563-3566**                    **FLORIDABADATZ@GMAIL.COM**

# Final Arbitration Award
# Exhibit A
# DHL notices

| ☐ | 7769448094 | Shipment Date | **July 10, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** ISAAC BTESH |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | CIUDAD DE PANAMA, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 7769446952 | Shipment Date | **July 10, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** YVONNE SNAIDER |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | PANAMA CITY, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 1891064195 | Shipment Date | **June 21, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** YVONNE SNAIDER |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | PANAMA CITY, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 1891060813 | Shipment Date | **June 21, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** ISAAC BTESH |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | CIUDAD DE PANAMA, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 1891047970 | Shipment Date | **June 21, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** RAQUEL MICHAAN |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | PANAMA CITY, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 3995137182 raquel | Shipment Date | **June 9, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** RAQUEL MICHAAN |
| | | Description | Letter, corresp... | Sunny Isles Beach, United States of America | PANAMA CITY, Panama |
| | Created By drinkandshrink18@gmail.com | | | | |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 3995125131 | Shipment Date | **June 9, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** YVONNE SNAIDER |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | PANAMA CITY, Panama |

Quick View  Print Labels  Copy  Create Return Label  Track

| ☐ | 6630378182 | Shipment Date | **June 9, 2023** | Ship From | Ship To |
|---|---|---|---|---|---|
| | Delivered | Delivery Option | EXPRESS ENVELOPE | **BEIS DIN OF FLORIDA -** BEIS DIN OF FLORIDA | **REJOVOT** ISAAC BTESH |
| | Created By drinkandshrink18@gmail.com | Description | Letter, corresp... | Sunny Isles Beach, United States of America | CIUDAD DE PANAMA, Panama |

# FINAL ARBITRATION AWARD
# EXHIBIT B
# PANAMA AGREEMENT
# JAN 2020



The Spanish Group LLC
1 Park Plaza, Suite 600
Irvine, CA 92614
United States of America
https://www.thespanishgroup.org

## Certified Translation

Furnished on the **10th of June, 2020**

I, Alexander Largaespada ( *[signature]* ), hereby certify that I translated the attached document from Spanish into English or English into Spanish and that this translation is an accurate and faithful translation of the original document. Furthermore, I certify that I am proficient in translating both Spanish and English and that I hold the capacity to render and certify the validity of such a translation.

I, Salvador Ordorica, as a Quality Assurance Agent of The Spanish Group LLC, hereby attest that the aforementioned translator is a proficient Spanish-English translator. Accordingly, as an authorized representative of The Spanish Group, I verify that I have proofread this document and I certify that the attached document is a faithful and authentic translation of its original.

Respectfully,

**Salvador G. Ordorica**
**The Spanish Group LLC**
**(ATA #267262)**



The Spanish Group LLC verifies the credentials and/or competency of its translators and the present certification, as well as any attached pages, serves to affirm that the document(s) enumerated above has/have been translated as accurately as possible from its/their original(s). The Spanish Group LLC does not attest that the original document(s) is are accurate, legitimate, or has/have not been falsified. Through having accepted the terms and conditions set forth in order to contract The Spanish Group LLC's services, and/or through presenting this certificate, the client releases, waives, discharges and relinquishes the right to present any legal claim(s) against The Spanish Group LLC. Consequently, The Spanish Group LLC cannot be held liable for any loss or damage suffered by the Client(s) or any other party either during, after, or arising from the use of The Spanish Group LLC's services.

## PRIVATE AGREEMENT

The undersigned, ISAAC ALBERTO BTESH BTESH (hereinafter "ISAAC"), acting in a personal capacity and as Vice President and member of the Foundation Board, on behalf and representation of FUNDACION ARYISA, a Panamanian private interest foundation, registered in Folio No. 25023224 of the Public Registry (hereinafter "ARYISA"), acting jointly with RAQUEL BTESH DE MICHAAN (hereinafter "RAQUEL"), acting in a personal capacity and as a member of the Foundation Board of ARYISA, and with YVONNE BTESH DE SNAIDER (hereinafter "YVONNE"), who acts in a personal capacity, and on behalf FUNDACION JOYVON (hereinafter "JOYVON"), the latter being part of this Agreement and a member of the Foundation Board of ARYISA, on the one hand, and on the other hand SALOMON ALBERTO BTESH BTESH (hereinafter "SALOMON"), acting in a personal capacity, and all jointly "THE PARTIES" have entered into this Private Agreement (hereinafter the "Agreement") as follows:

Statements:

WHEREAS RAQUEL, SALOMON, ISAAC and JOYVON are beneficiaries of ARYISA.

WHEREAS RAQUEL, ISAAC and JOYVON are the surviving members of the Foundation Board of ARYISA.

WHEREAS, RAQUEL, SALOMON, ISAAC, YVONNE are the Protectors of ARYISA.

WHEREAS, the parties agree as follows:

Obligations:

1.      Within eight (8) working days following the signing of this Agreement RAQUEL, ISAAC and JOYVON agree to cause the delivery to SALOMON of the sum of TEN MILLION AMERICAN DOLLARS with 00/100 ($10,000,000.00) in cash or its equivalent of the assets controlled by ARYISA and SALOMON accepts said sum as herein provided and as stipulated in the Regulations of ARYISA established by its Founder.

2.      Within eight (8) business days after the signing of this Agreement RAQUEL, ISAAC and JOYVON agree to cause the delivery to SALOMON's wife, DEBORAH BTESH, of the sum of SEVEN HUNDRED AND FIFTY THOUSAND AMERICAN DOLLARS WITH 00/100 ($750,000.00) in cash or its equivalent of the assets controlled by ARYISA, and SALOMON accepts said sum as provided herein. This money will be given to DEBORAH BTESH as custody under the understanding guaranteed by SALOMON that each of SALOMON's daughters who have not received it to date will each receive the sum of TWO HUNDRED AND FIFTY THOUSAND AMERICAN DOLLARS WITH 00/100 ($250,000.00) upon marriage and that this amount was already given to RAQUEL BTESH, daughter of SALOMON, completing the sum of ONE MILLION AMERICAN DOLLARS WITH 00/100 ($1,000,000.00) for the daughters of SALOMON.

3.      Upon delivery of the amounts set forth in the preceding paragraph, it will be perfected the waiver that SALOMON hereby expresses to any position, right, privilege, benefit or patrimony to which he is or may be entitled in relation to ARYISA, whether as beneficiary, protector, son of the Founder or any other concept of any nature.

4.      In addition to the above and only in case and when the purchase of the shares of MULTI FINANCIAL GROUP INC. currently held by ISAAC, RAQUEL and JOYVON, which is currently in the process of being closed (the "Purchase in Progress"), and provided that ISAAC, RAQUEL and JOYVON receive the proceeds of said sale, ISAAC, RAQUEL and JOYVON agree to deliver the lump sum of FIFTEEN MILLION TWO HUNDRED AND FIFTY THOUSAND AMERICAN DOLLARS WITH 00/100 ($15,250,000,000.00) in cash or its equivalent to SALOMON within fifteen (15) days from the date on which ISAAC, RAQUEL and JOYVON receive the proceeds of such share purchase transaction. Any breach of the provisions of this Agreement by SALOMON will result in SALOMON having to return to ISAAC, RAQUEL and JOYVON the full amount of funds referred to in this paragraph.

5.      THE PARTIES acknowledge and accept that the payment provided for in the preceding paragraph is strictly conditional on the closing of the purchase operation described therein. Therefore, in the event that such transaction is not closed for any reason, then they shall be exempted from making such payment to SALOMON. In that case only, SALOMON waives any claim in that sense against ARYISA, RAQUEL, ISAAC, JOYVON and/or YVONNE.

6.      Provided that the Purchase in Progress is closed and within fifteen (15) days from the date that ISAAC receives the proceeds of such transaction, ISAAC agrees to make a payment in cash or its equivalent on behalf of ISAAC CHAMA and/or MOUSSA CHAMA for the sum of THREE MILLION AMERICAN DOLLARS WITH 00/100 ($3,000,000.00) and to instruct such persons that such monies be given to charitable works ("Tzedaka") chosen by SALOMON by written instructions, for the elevation of the Soul of ALBERTO SALOMON BTECHE HAZZAN, provided that such works are recognized as Tzedaka according to Orthodox Jewish tradition or any other donation that constitutes "Maaser" according to the Orthodox Jewish law. In the event that Mr. ISAAC CHAMA and/or MOUSSA CHAMA are unable or unwilling to administer such fund, THE PARTIES will designate other persons or institutions by mutual agreement. It is understood that this obligation will be extinguished in the event that the purchase of the shares of MULTI FINANCIAL GROUP INC. is not concluded for any reason and in that case only, SALOMON waives any claim in that regard against ISAAC. Any breach of this Agreement by SALOMON shall result in SALOMON having to return to ISAAC, RAQUEL and JOYVON the full amount of funds referred to in this paragraph.

7.      In the event that (D's free) the Purchase in Progress is not concluded, SALOMON shall retain the same rights as defined in numbers 4 and 6 of this Agreement, provided that ISAAC, JOYVON, Raquel or their successors carry out another transaction for the purchase of their participations in Multibank Group and between these receive at least the sum of FOUR HUNDRED FIFTEEN MILLION AMERICAN DOLLARS ($415,000,000.00) net after subtracting expenses, taxes and debts or other emoluments resulting from the transaction and that said transaction is perfected before January 22, 2024.

8.      By signing this Agreement, and subject to the payment of the amounts set forth in the first two paragraphs, the payment set forth in paragraph 4 (provided that the closing of said Purchase in Progress or the purchase set forth in paragraph 7 occurs) and the materialization of the provisions set forth in paragraph 6 (provided that the closing of said Purchase in Progress or the purchase set forth in paragraph 7 occurs), SALOMON irrevocably waives, in his own name and that of his descendants and heirs, any and all claims of any nature whatsoever, whether civil, criminal, administrative, religious, labor or otherwise, anywhere in the world against ISAAC, YVONNE, JOYVON, RAQUEL, ARYISA, the estate and patrimony of ALBERTO SALOMON BTECHE HAZZAN, MULTI FINANCIAL GROUP INC., MULTIBANK, INC. and all subsidiaries and/or affiliates (known as "Multibank Group"), their respective shareholders, directors, dignitaries, managers, advisors and natural or legal entities under their control or under joint control of the Multibank Group, as well as all relatives within the first and second degree of consanguinity of ISAAC, YVONNE and/or RAQUEL, who are hereby released from responsibility in connection with the matters covered by this Agreement. In addition to the foregoing, and except for items 4 and 6 of this Agreement, SALOMON hereby irrevocably waives any right and/or actual and/or potential benefit of any nature whatsoever directly or indirectly related to the purchase of the shares of MULTI FINANCIAL GROUP INC. Therefore, SALOMON hereby irrevocably waives any actual and/or potential claims of any nature whatsoever, whether civil, criminal, accounting, administrative, labor, religious or otherwise, against ISAAC, YVONNE, JOYVON, FUNDACION MATINION, RAQUEL, ALPAMICO, S. A. and/or the succession of ALBERTO SALOMON BTECHE HAZZAN that is directly or indirectly related to the ownership, control, property, possession, transfer, delivery, disposal or any other type of transaction related to the shares of MULTI FINANCIAL GROUP INC, including, in the broadest manner, each and every one of the companies, persons, advisors, dignitaries, managers and/or employees related to the Multibank Group.

9.      On their part, subject to SALOMON's compliance with the agreed upon in this Agreement, ARYISA, YVONNE, ISAAC and RAQUEL release SALOMON from any existing or potential claim to which they are or have been entitled to up to the date of this Agreement, whether civil, criminal, administrative, religious, labor or any other kind of claim in any part of the world against him.

10.     SALOMON agrees to defend and indemnify ARYISA, ISAAC, JOYVON, RAQUEL and YVONNE (the "SALOMON Indemnitees") in the event that any child, descendant or heir of SALOMON makes any claim against the SALOMON Indemnitees that relates to the terms of this Agreement or any other reason.

11.     ARYISA, ISAAC, JOYVON, RAQUEL and YVONNE (the "ARYISA Indemnitees") agree to defend and indemnify SALOMON in the event that any child, descendant, successor, beneficiary or heir of the ARYISA Indemnitees files any claim against SALOMON that relates to the terms of this Agreement or any other reason.

12. Subject only to the outstanding obligations and their respective conditions, THE PARTIES hereby grant each other a full and sufficient settlement as may be required by law.

13. THE PARTIES agree to maintain family harmony and to resolve any disagreements in an amicable manner.

14. THE PARTIES declare that they have not suffered any harm from the actions of THE PARTIES.

15. Everything in this Agreement is strictly confidential and may not be disclosed to any third party without the consent of THE PARTIES.

16. In the event of any difference or dispute as to the performance, interpretation, execution and/or scope of this document, THE PARTIES submit exclusively to the alternative dispute resolution methods in effect for members of the Israeli Charitable Society Shevet Ahim, waiving any other legal recourse in any jurisdiction.

Given in Panama, Republic of Panama, on the twenty-second (22) day of the month of January, 2020.

SALOMON ALBERTO BTESH BTESH

RAQUEL BTESH DE MICHAAN

ISAAC ALBERTO BTESH BTESH

YVONNE BTESH DE SNAIDER
FUNDACION JOYVON

Witness: RABBI DORON MIARA

Witness: DAVID M. MIZRACHI

# FINAL ARBITRATION AWARD
# EXHIBIT C
# FUNDACION ARYISA
# BY LAWS

*[the following stamp appears on each page (complete on page 1; partial in the top left corner of pages 2-8; partial in the bottom left corner of pages 9-11): "REPUBLIC OF PANAMA; NOTARY FOUR OF THE CIRCUIT"; coat of arms of Panama]*

*[illegible initials appear on each page]*

*["BYLAWS OF THE FUNDACION ARYISA" and the respective page number appear on the bottom of pages 1-5]*

## BYLAWS
## of the Foundation named
## FUNDACION ARYISA

Created by public instrument no. 228 of January 6, 2015, of Notary Office Four of the Circuit of Panama City, and registered in Folio 25023224 of the Public Registry of the Republic of Panama.

The undersigned, ALBERTO SALOMON BTECHE HAZZAN, male, Panamanian, a banker, of legal age, unmarried, with national identification card no. 8-86-99, in his capacity as founder (hereinafter "THE FOUNDER"), and in accordance with Law 25 of June 12, 1995, based on the articles of incorporation of FUNDACION ARYISA (the "Foundation"), hereby issues the following bylaws for the Foundation:

## ARTICLE 1:
### Enjoyment of the Assets by the Universal Beneficiary

During his life, the assets of the foundation and the proceeds of the assets may solely and exclusively be enjoyed and used by **ALBERTO SALOMON BTECHE HAZZAN,** male, Panamanian, a banker, of legal age, unmarried, with national identification card no. 8-86-99, (hereinafter the "Universal Beneficiary").

The Universal Beneficiary may use, utilize, change, swap, reduce, transfer, alter, diminish, destroy, usufruct, assign, reassign, pledge, commit, dispose of, exchange, and perform any transaction with such assets without limitation and without any obligation to provide any justification.

In consideration of the foregoing, the fact that one or more Beneficiaries have been designated as such in these Bylaws does not create an expectation regarding its yields, given that the Universal Beneficiary may unilaterally diminish, reduce, increase, or dissipate, in whole or in part, the Foundation's assets without creating any liability whatsoever in favor of the Beneficiaries.

The Assets of the Foundation are different, separate Assets from those of THE FOUNDER. The Founder and his heirs, children, and relatives will have no right to the Assets of the Foundation, except for the rights reserved exclusively for the Universal Beneficiary while he lives, and for the Secondary Beneficiaries when the Universal Beneficiary dies.

## ARTICLE 2:
### Description of the Assets

The assets of the Foundation consist of the following, which THE FOUNDER hereby donates to the Foundation:

1. 66.67% of paid-in, issued, and outstanding shares of the Panamanian corporation PLAZA VANDOOM, S.A., consisting of 2,400 shares of such corporation. This company owns the business premises, parking lots, and common areas of the P.H. Plaza Concordia Shopping Center, details of which are included in Appendix A.

2. 100% of the paid-in, issued, and outstanding shares of the Panamanian corporation INVERSIONES MAURITANIA, S.A., consisting of 100 common shares. This company owns parcel 59801, consisting of a piece of land located in Parque Lefevre, Panama City, Republic of Panama.

3. 100% of the paid-in, issued, and outstanding shares of the Panamanian corporation INVERSIONES BRAMOR, S.A., consisting of 100 common shares. This company owns 50% of parcel 15162, where the Gran Morrison Store on Via España is located.

4. 100% of the paid-in, issued, and outstanding shares of the Panamanian company YOMTOV, S.A., consisting of 100 common shares. This company owns parcel 26844, located in Obarrio, Panama City, Republic of Panama (where THE FOUNDER currently resides) (the "Residence"); parcel 5488, located in Santa Clara, Province of Cocié, Republic of Panama; and is in the process of receiving as a donation from THE FOUNDER parcel 6345, located in Santa Clara, Province of Cocié, Republic of Panama.

5. 55% of the paid-in, issued, and outstanding shares of the Panamanian company **INVERSIONES CRESCENT DRIVE, S.A.**, consisting of 275 common shares of that company, which in turn owns:

a. 100% of the shares of the Panamanian corporation PROMOTORA PROSPERIDAD, S.A., which in turn owns:

    i. 100% of the shares of other real estate companies, as listed in Appendix B.

b. 100% of the paid-in, issued, and outstanding shares of the Panamanian company INVERSIONES COSTA PALMIRA, which in turn owns:

    i. 70% of the paid-in, issued, and outstanding shares of the Panamanian company PROMOTORA CASAS PACIFICAS, S.A. and affiliated companies, as shown in Appendix C.

c. 100% of the paid-in, issued, and outstanding shares of the Panamanian corporation INMOBILIARIA CORAL SEA, S.A., owner of the assets described in Appendix D.

6. 100% of the paid-in, issued, and outstanding shares of the British Virgin Islands (BVI) company named MILANO EXPORT COMPANY INC., which in turn owns various investment accounts, checking accounts, savings accounts, and time certificates, as described in Appendix E.

7. A fixed term deposit at Banco Aliado, which is hereby donated to Fundación Aryisa.

The above includes control of all investments, securities, money, rights and assets to which these companies have access, according to the percentage of shares belonging to the Foundation. During his lifetime, the Universal Beneficiary will enjoy the yields of the Assets, and only on his death will the Secondary Beneficiaries receive the yields of the Assets and the proceeds of its liquidation, as described in Articles 3 and 7.

### ARTICLE 3:
### Distribution among Beneficiaries

**A. Specific Legacies**

Upon the death of the Universal Beneficiary, the Foundation will cause its cash positions and cash-convertible securities to be liquidated in order to make the following distributions:

1. The sum of TEN MILLION US DOLLARS AND 00/100 (USD 10,000,000.00) will be given to SALOMON ALBERTO BTESH, the son of THE FOUNDER.

2. A fund of ONE MILLION US DOLLARS (USD 1,000,000.00) will be established, from which the sum of TWO HUNDRED FIFTY THOUSAND US DOLLARS will be given to each of the four (4) daughters that SALOMON ALBERTO BTESH currently has when each of them marries.

3. A fund of ONE MILLION US DOLLARS (USD 1,000,000.00) will be established and the proceeds from this fund will be given annually to the Scholarship Fund of the Instituto Alberto Einstein in memory of THE FOUNDER and his wife Pamela Btesh de Btesh.

4. In addition, the Residence will be used free of charge by the FUNDACION ALBERTO Y PAMELA BTESH and will become an Art Museum with most of THE FOUNDER's artworks. This will be managed directly by the FUNDACION ALBERTO Y PAMELA BTESH, which will pay for its operating expenses.

**B. Distribution of Remaining Assets to the Secondary Beneficiaries**

After making the specific provisions and payments set forth in Section A above, the Foundation, through the Foundation Board, will continue to manage its assets in the normal course of business. All yields, returns, and/or interest produced by the assets of the Foundation will be distributed in equal shares to the following persons (the "Secondary Beneficiaries"), as follows:

a. 25% for MICHAAN RACHEL BTESH;
b. 25% for YVONNE BTESH DE SNAIDER
c. 25% for ISAAC ALBERTO BTESH;

d. 25% for FUNDACION ALBERTO Y PAMELA BTESH to continue its charity work.

If a majority of the Foundation Board, as provided for in Article 4, chooses to liquidate any of the Foundation's assets or even to liquidate the Foundation, the proceeds of such partial or total liquidation will be distributed in the same proportions set forth in this Article.

**ARTICLE 4:**
**The Foundation Board**

The Foundation Board will not take up its duties until the death or proven mental incapacity of THE FOUNDER, who reserves all of the rights of the Foundation Board as long as he lives or has full capacity. Decisions of the Foundation Board must be made by an absolute majority of its members. Its functions are those set forth in the Foundation's Founding Charter and those reserved by THE FOUNDER in such document, as well as the functions established by law.

In the event of the death of THE FOUNDER, ISAAC ALBERTO BTESH will become the President of the Foundation; the other members of the Board will remain in their positions as Board members, as provided for in the Founding Charter. ALBERTO ISAAC BTESH HAKIM, as an individual member, will represent the FUNDACIÓN ALBERTO Y PAMELA BTESH within the Fundación Aryisa. The remaining dignitaries on the Board of the Fundación Aryisa will be selected by a majority vote of the Foundation Board.

In the event of the death, resignation, or mental incapacity of any other member of the Foundation Board, such member will be replaced by the person appointed by a majority of the remaining members, ensuring that there are always four (4) members on the Foundation Board.

The mental incapacity of THE FOUNDER, any member of the Board, or any Beneficiary will be determined by a majority vote by the Foundation's medical committee, composed of the doctors PERCY NUÑEZ, ELIAS NEVAH, and JACOBO BASSAN. This medical committee will appoint its replacements in the event of the death or resignation of any of its members.

In the event of the mental incapacity of THE FOUNDER, the Foundation's primary obligation will be to guarantee THE FOUNDER's well-being, including any medical treatments that may be required to maintain the dignity that he has been accustomed to over the past five years, residing in his customary home with high-level professional care. Any decisions relating to the provisions of this paragraph shall be made by an absolute majority of the Foundation Board.

**ARTICLE 5:**
**Investment Management**

After THE FOUNDER has been declared mentally incompetent as defined in the preceding article, or after his death:

a. Any transactions not provided for in these Bylaws must be approved by a majority of the Foundation Board.

b. Payments authorized by these Bylaws or payments required to fulfill the purposes of the Foundation must bear two signatures. The first signature will be that of ISAAC ALBERTO BTESH and the second signature will be that of RACHEL BTESH DE MICHAAN or YVONNE BTESH DE SNAIDER.

**ARTICLE 6:**
**The Custodians**

THE FOUNDER hereby appoints the following custodians: a) Jack Eskenazi Talgham-Cohen, b) Simón Hafeitz Homsany, and c) Diego Velez, to hold the originals of these Bylaws and to notify the Foundation Board of their existence and content as soon as they become aware of the death or possible incapacity of THE FOUNDER.

Each custodian shall keep his authenticated copy of the Bylaws in a safe place and shall not disclose its contents until the conditions set forth in the preceding paragraph have been met. Prior to notifying the Board, each custodian will attempt to contact the other two custodians in order to coordinate the fulfillment of their duties.

Once the Board has been notified, the custodians will be relieved of their responsibility.

**ARTICLE 7:**
**Amendments to the Bylaws**

These Bylaws can be amended at any time by THE FOUNDER. After the death of THE FOUNDER, they can only be

amended by a qualified majority of 75% of the votes of the Foundation Board, except in matters involving the Beneficiaries' shares in the distribution of the Assets or the yields.

In the event of any difference or inconsistency between the contents of these Bylaws and the contents of the founding charter, the provisions of these Bylaws will always prevail.

Any dispute or controversy concerning the Foundation, its assets, yields, these Bylaws, the founding charter, or any other similar matter will be referred to the Arbitration Committee of the Sociedad Israelita de Beneficencia Shevet Ahim, in accordance with its rules of procedure.

Issued in Panama City, Republic of Panama, and signed before a Notary Public in five (5) identical originals with the same effects, today, February second (2), 2015.

**THE FOUNDER:**

[stamp: "REPUBLIC OF PANAMA; NOTARY FOUR OF THE CIRCUIT"; *coat of arms of Panama*]

[*signature*]
I, NATIVIDAD QUIRÓS AGUILAR, Notary Public Four of the Circuit of Panama City, with national identification card no. 2-106-1790

CERTIFY:
That the above signature(s) has(have) been compared against the signature on the copy of the national identification card or passport of the (*illegible*), and in my opinion they are similar, and therefore (*illegible*) signature(s) is(are) authentic.
Panama, 2/2/2015 (*handwritten*)
  [*signature*]        [*signature*]
    WITNESS              WITNESS
[*signature*]
(*illegible*)
Notary Public Four

[stamp: "REPUBLIC OF PANAMA; NOTARY FOUR OF THE CIRCUIT"; *coat of arms of Panama*]

**APPENDIX A**

FINCAS DE PLAZA VANDOOM, INC—ASSESSED VALUES

| # | Parcel | Verification Number | Tax ID No. (N.I.T.) | Premises No. | Acquisition Date | Expiration of the exemption from the Property Tax | Value of the property in the Panamanian Tax Agency (DGI) | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Land | Improvements |
| 1 | 30795-8706 | 46 | 3434robe | 002 PB | 05-26-1994 | 12/10/2013 | 7,400 | 170,200 |
| 2 | 30796-8706 | 81 | 3434robe | 003 PB | 05-26-1994 | 12/10/2013 | 9,300 | 213,900 |
| 3 | 30799-8706 | 98 | 3434robe | 008 PB | 05-26-1994 | 12/10/2013 | 7,300 | 167,900 |
| 4 | 30800-8706 | 39 | 3434robe | 009 PB | 05-26-1994 | 12/10/2013 | 7,300 | 167,900 |
| 5 | 30801-8706 | 74 | 3434robe | 010 PB | 05-26-1994 | 12/10/2013 | 6,800 | 156,400 |
| 6 | 30802-8706 | 00 | 3434robe | 0011 PB | 05-26-1994 | 12/10/2013 | 6,800 | 156,400 |
| 7 | 30804-8706 | 80 | 3434robe | 014 PB | 05-26-1994 | 12/10/2013 | 6,800 | 156,400 |
| 8 | 30805-8706 | 16 | 3434robe | 015 PB | 05-26-1994 | 12/10/2013 | 6,800 | 156,400 |
| 9 | 30806-8706 | 51 | 3434robe | 016 PB | 05-26-1994 | 12/10/2013 | 11,100 | 255,300 |
| 10 | 30807-8706 | 97 | 3434robe | 101 | 05-26-1994 | 12/10/2013 | 9,400 | 216,200 |
| 11 | 30812-8706 | 36 | 3434robe | 107 | 05-26-1994 | 12/10/2013 | 7,600 | 174,800 |
| 12 | 30814-8706 | 7 | 3434robe | 110 A | 05-26-1994 | 12/10/2013 | 54,700 | 1,258,100 |
| 13 | 30815-8706 | 42 | 3434robe | Administration Office | 05-26-1994 | 12/10/2013 | 8,000 | 184,000 |
| 14 | 30816-8706 | 88 | 3434robe | 112 | 05-26-1994 | 12/10/2013 | 2,900 | 66,700 |
| 15 | 30817-8706 | 13 | 3434robe | 113 | 05-26-1994 | 12/10/2013 | 4,100 | 94,300 |
| 16 | 30818-8706 | 59 | 3434robe | 114 A | 05-26-1994 | 12/10/2013 | 19,300 | 443,900 |
| 17 | 30819-8706 | 94 | 3434robe | 115 A | 05-26-1994 | 12/10/2013 | 18,600 | 427,800 |
| 18 | 30820-8706 | 91 | 3434robe | 116 A | 05-26-1994 | 12/10/2013 | 18,600 | 427,800 |
| 19 | 30821-8706 | 27 | 3434robe | 117 A | 05-26-1994 | 12/10/2013 | 19,300 | 443,900 |
| 20 | 30822-8706 | 62 | 3434robe | 118 A | 05-26-1994 | 12/10/2013 | 18,900 | 434,700 |
| 21 | 30823-8706 | 6 | 3434robe | 121 | 05-26-1994 | 12/10/2013 | 13,800 | 317,400 |
| 22 | 30824-8706 | 33 | 3434robe | 122 | 05-26-1994 | 12/10/2013 | 7,400 | 170,200 |
| 23 | 30825-8706 | 79 | 3434robe | 123 | 05-26-1994 | 12/10/2013 | 5,600 | 128,800 |
| 24 | 30828-8706 | 04 | 3434robe | 124 | 05-26-1994 | 12/10/2013 | 5,400 | 138,135 |
| 25 | 30829-8706 | 10 | 3434robe | 127 | 05-26-1994 | 12/10/2013 | 3,400 | 78,200 |
| 26 | 30832-8706 | 99 | 3434robe | 130 | 05-26-1994 | 12/10/2013 | 6,800 | 156,400 |
| 27 | 30838-8706 | 01 | 3434robe | 135 | 05-26-1994 | 12/10/2013 | 5,700 | 131,100 |
| 28 | 30839-8706 | 47 | 3434robe | 136 | 05-26-1994 | 12/10/2013 | 7,700 | 177,100 |
| 29 | 30841-8706 | 80 | 3434robe | 138 | 05-26-1994 | 12/10/2013 | 5,700 | 131,100 |
| 30 | 30842-8706 | 15 | 3434robe | 139 | 05-26-1994 | 12/10/2013 | 5,700 | 131,100 |
| 31 | 30845-8706 | 21 | 3434robe | 142 | 05-26-1994 | 12/10/2013 | 6,000 | 138,000 |
| 32 | 30847-8706 | 00 | 3434robe | 144 | 05-26-1994 | 12/10/2013 | 7,200 | 165,600 |
| 33 | 30862-8706 | 78 | 3434robe | 130 A | 05-26-1994 | 12/10/2013 | 5,400 | 124,200 |
| 34 | 30863-8706 | 3 | 3434robe | 131 A | 05-26-1994 | 12/10/2013 | 8,100 | 186,300 |
| 35 | 30864-8706 | 49 | 3434robe | 132 A | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |
| 36 | 30865-8706 | 84 | 3434robe | 133 A | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |
| 37 | 30866-8706 | 10 | 3434robe | 134 A | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |
| 38 | 30868-8706 | 90 | 3434robe | 135 | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |
| 39 | 30869-8706 | 26 | 3434robe | 136 A | 05-26-1994 | 12/10/2013 | 9,300 | 213,900 |
| 40 | 30870-8706 | 23 | 3434robe | 138 A | 05-26-1994 | 12/10/2013 | 8,000 | 184,000 |
| 41 | 30871-8706 | 69 | 3434robe | 139 A | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |

FINCAS DE PLAZA VANDOOM, INC—ASSESSED VALUES

| # | Parcel | Verification Number | Tax ID No. (N.I.T.) | Premises No. | Acquisition Date | Expiration of the exemption from the Property Tax | Value of the property in the Panamanian Tax Agency (DGI) | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Land | Improvements |
| 42 | 30872-8706 | 02 | 3434robe | 101 A | 05-26-1994 | 12/10/2013 | 8,500 | 195,500 |
| 43 | 30873-8706 | 30 | 3434robe | 102 A | 05-26-1994 | 12/10/2013 | 18,900 | 434,700 |
| 44 | 30874-8706 | 75 | 3434robe | 200 | 05-26-1994 | 12/10/2013 | 6,000 | 138,000 |
| 45 | 30875-8706 | 00 | 3434robe | 201 | 05-26-1994 | 12/10/2013 | 9,400 | 216,240 |
| 46 | 30876-8706 | 46 | 3434robe | 202 | 05-26-1994 | 12/10/2013 | 6,500 | 149,500 |
| 47 | 30877-8706 | 81 | 3434robe | 203 | 05-26-1994 | 12/10/2013 | 7,600 | 174,800 |
| 48 | 30878-8706 | 17 | 3434robe | 204 | 05-26-1994 | 12/10/2013 | 1,000 | 230,000 |
| 49 | 30879-8706 | 52 | 3434robe | 210 | 05-26-1994 | 12/10/2013 | 8,900 | 204,700 |
| 50 | 30881-8706 | 95 | 3434robe | 212 | 05-26-1994 | 12/10/2013 | 3,100 | 71,300 |
| 51 | 30882-8706 | 20 | 3434robe | 213 | 05-26-1994 | 12/10/2013 | 5,700 | 131,100 |
| 52 | 30883-8706 | 66 | 3434robe | 214 | 05-26-1994 | 12/10/2013 | 9,800 | 225,400 |
| 53 | 30884-8706 | 0 | 3434robe | 215 | 05-26-1994 | 12/10/2013 | 4,100 | 94,300 |
| 54 | 30888-8706 | 43 | 3434robe | 219 | 05-26-1994 | 12/10/2013 | 7,500 | 172,500 |
| 55 | 30889-8706 | 89 | 3434robe | 220 | 05-26-1994 | 12/10/2013 | 6,600 | 151,800 |
| 56 | 30890-8706 | 86 | 3434robe | 221 | 05-26-1994 | 12/10/2013 | 6,500 | 149,500 |
| 57 | 30891-6799 | 01 | 3434robe | 222 | 05-26-1994 | 12/10/2013 | 8,000 | 184,000 |
| 58 | 30892-8706 | 57 | 3434robe | 223 | 05-26-1994 | 12/10/2013 | 11,000 | 253,000 |
| 59 | 30893-8706 | 92 | 3434robe | 224 | 05-26-1994 | 12/10/2013 | 3,100 | 71,300 |
| 60 | 30894-8706 | 28 | 3434robe | 224 A | 05-26-1994 | 12/10/2013 | 2,000 | 46,000 |
| 61 | 30895-8706 | 63 | 3434robe | 225 | 05-26-1994 | 12/10/2013 | 2,800 | 64,400 |
| 62 | 30896-8706 | 07 | 3434robe | 226 | 05-26-1994 | 12/10/2013 | 3,100 | 71,300 |
| 63 | 30897-8706 | 34 | 3434robe | 227 | 05-26-1994 | 12/10/2013 | 3,200 | 73,600 |
| 64 | 30898-8706 | 70 | 3434robe | 227 A | 05-26-1994 | 12/10/2013 | 3,900 | 89,700 |
| 65 | 30899-8706 | 05 | 3434robe | 228 | 05-26-1994 | 12/10/2013 | 3,200 | 73,600 |
| 66 | 30900-8706 | 56 | 3434robe | 229 | 05-26-1994 | 12/10/2013 | 2,800 | 64,400 |
| 67 | 30901-8706 | 91 | 3434robe | 230 | 05-26-1994 | 12/10/2013 | 2,800 | 64,400 |
| 68 | 30902-8706 | 27 | 3434robe | 231 | 05-26-1994 | 12/10/2013 | 3,200 | 73,600 |
| 69 | 30903-8706 | 62 | 3434robe | 231 A | 05-26-1994 | 12/10/2013 | 2,600 | 59,800 |
| 70 | 30904-8706 | 06 | 3434robe | 232 | 05-26-1994 | 12/10/2013 | 14,100 | 324,300 |
| 71 | 30905-8706 | 33 | 3434robe | 233 | 05-26-1994 | 12/10/2013 | 7,300 | 167,900 |
| 72 | 30906-8706 | 79 | 3434robe | 234 | 05-26-1994 | 12/10/2013 | 5,600 | 128,800 |
| 73 | 30907-8706 | 04 | 3434robe | 235 | 05-26-1994 | 12/10/2013 | 5,300 | 121,900 |
| 74 | 30908-8706 | 40 | 3434robe | 236 | 05-26-1994 | 12/10/2013 | 6,200 | 142,600 |
| 75 | 30912-8706 | 53 | 3434robe | 240 | 05-26-1994 | 12/10/2013 | 5,500 | 126,500 |
| 76 | 30913-8706 | 99 | 3434robe | 241 | 05-26-1994 | 12/10/2013 | 5,600 | 128,800 |
| 77 | 30914-8706 | 24 | 3434robe | 242 | 05-26-1994 | 12/10/2013 | 7,000 | 161,000 |
| 78 | 30916-8706 | 03 | 3434robe | 244 | 05-26-1994 | 12/10/2013 | 5,000 | 115,000 |
| 79 | 30917-8706 | 30 | 3434robe | 245 | 05-26-1994 | 12/10/2013 | 7,000 | 161,000 |
| 80 | 30919-8706 | 01 | 3434robe | 247 | 05-26-1994 | 12/10/2013 | 4,700 | 108,100 |
| 81 | 30920-8706 | 09 | 3434robe | 248 | 05-26-1994 | 12/10/2013 | 5,800 | 133,400 |
| 82 | 30923-8706 | 15 | 3434robe | 251 | 05-26-1994 | 12/10/2013 | 3,700 | 85,100 |
| | | | | | | | 639,800 | 14,936,375 |

**APPENDIX B**

| | Company | Tax ID No. (RUC) | Properties | Parcels | Issued and Outstanding Shares | Certificate Numbers |
|---|---|---|---|---|---|---|
| | PROMOTORA PROSPERIDAD, S.A. | 1862882-1-715629 | Owner of companies owning real estate | N/A | Not issued | Not issued. In the process of being issued. |
| 1 | BULLION CORPORATION | 1499266-1-647288 | Owner of Property Los Pueblos Branch. | 41041 and 41042 | 500 shares issued. | No. 1—five hundred shares. In the process of being transferred to Promotora Prosperidad, S.A. |
| 2 | MADRAS BUSINESS, INC | 1573244-1-661145 | Owner of property San Miguelito and David Branch. | (i) 1295, (ii) 48805 | 500 shares issued. | No. 1—five hundred shares. In the process of being transferred to Promotora Prosperidad, S.A. |
| 3 | DESARROLLO E INVERSIONES GIACCOMO, S.A. | 1511613-1-649800 | Owner of property Zona Libre and Plaza Pacifica Branch | (i) 53188; (ii) 37769; and (iii) 37770 | 500 shares issued. | No. 1—five hundred shares. In the process of being transferred to Promotora Prosperidad, S.A. |
| 4 | CAPITALES Y PARTICIPACIONES CASA MAYOR, S.A. | 1511680-1-649820 | Owner of property Chorrera Branch | 50714 and 51380 | 500 shares issued. | No. 1—five hundred shares. In the process of being transferred to Promotora Prosperidad, S.A. |
| 5 | ESCARLATA INTERNATIONAL, S.A. | 1055124-1-548523 | Owner of Property Transistmica Branch | 21516 | 100 shares issued. | No. 1—one hundred shares. In the process of being transferred to Promotora Prosperidad, S.A. |
| 6 | ANTLIA DEVELOPMENT, CORP. | 1787587-1-703133 | Owner of property Costa del Este Branch. | 65062 and 65063 | Not issued | Not issued |
| 7 | GREAT FORKS INVESTMENT, INC | 1790763-1-703657 | Owner of property Coronado Branch. | 340187 PH | 100 shares issued. | No. 1—one hundred shares. In favor of Promotora Prosperidad. |
| 8 | LONDRINA REAL ESTATE, S.A. | 1870660-1-717041 | Owner of property Albrook Branch. | 59951 PH | 100 shares issued. | No. 1—one hundred shares. In favor of Promotora Prosperidad. |
| 9 | LYON REAL ESTATE INC. | 1790858-1-703677 | Owner of Property Chitre Branch | 97789 | 100 shares issued. | No. 1—one hundred shares. In favor of Promotora Prosperidad. |
| 10 | COROTU REAL ESTATE, S.A. | 2654310-1-841236 | Development of the Penonomé shopping mall is in progress | 26768 | 100 shares issued. | No. 1—one hundred shares. In favor of Promotora Prosperidad. |

**APPENDIX C**

| | Company | Tax ID No. (RUC) | Properties | Parcels | Issued and Outstanding Shares | Certificate Numbers |
|---|---|---|---|---|---|---|
| 1 | INVERSIONES COSTA PALMIRA, S.A. | 1055142-1-548525 | Company owning 70% of Promotora Casas Pacificas and associated companies | N/A | 100 shares issued. | No. 1—one hundred shares. Bearer shares, in process of being issued in favor of Inversiones Crescent Drive, S.A. |
| | PROMOTORA CASAS PACIFICAS, S.A. | 1004233-1-536712 | Development of real estate projects in Pacora. | N/A | 300 shares issued. | No. 1—two hundred one shares (67%). In favor of Inversiones Costa Palmira, S. A. In process of being replaced to reach 70%. |
| | | | | | | No. 2—ninety-nine shares. Endorsed. In the process of being replaced. |
| 2 | RESTING VALLEY | 829811-1-501712 | Company holding debt from loan for land developed by Promotora Casas Pacificas, S.A. (Cabras de Pacora). SM 2 AND 3 | N/A | Not issued. | Not issued. |
| 3 | QUERENCIA INVERSIONISTA | 1189936-1-579981 | Company holding debt from loan for land to be developed by Promotora Casas Pacificas, S.A. (Cabras de Pacora) SM 4 AND 5 | N/A | Not issued. | Not issued. |
| 4 | CORPORACION PRADO VIEJO, S. A. | 2183153-1-770670 | Company owning Sydney Town Corp | N/A | Not issued. | Not issued. |
| 5 | SYDNEY TOWN CORPORATION | 2103642-1-757285 | Company owning additional land in Cabras de Pacora (23 hectares) to be developed by Casas Pacificas | 23 hectare parcel, purchase value: $2.5 million | 500 shares. | No. 1—five hundred issued in favor of Corporación Prado Viejo, S.A. |
| 6 | DESARROLLO SANTA FE, S.A. (formerly INVERSIONES PRADO NUEVO S.A.) | 2511358-1-820387 | Company owning Desarrollo Prado Viejo, S.A. | N/A | Not issued. | Not issued. |
| 7 | DESARROLLO PRADO VIEJO, SA. | 2661154-1-819758 | Company owning parcels 10, 12, and 14, of 6 hectares, in Cabras de Pacora for development by Casas Pacificas | Parcels 10, 12, and 14.6 hectares, purchase value: $932 million | Not issued. | Not issued. |
| 8 | DESARROLLO NEPTUNO CORP (formerly INVERSIONES PRADO VIEJO, S.A.) | 2457394-1-813042 | Company owning SM 8 of 10 hectares in Cabras de Pacora, to be developed by Casas Pacificas | Super Parcel block 8 of 10 hectares, 2,946 square meters. purchase value: $2.5 million | Not issued. | Not issued. |

ANNEX D

| | Company | Tax ID No. (RUC) | Properties | Parcels | Issued and Outstanding Shares | Certificate Numbers |
|---|---|---|---|---|---|---|
| | INMOBILIARIA CORAL SEA, S.A. | 785248-1-489409 | Owner of real estate companies and other projects | N/A | Not issued. | Not issued. |
| 1 | GREAT DRAGO REAL STATE, INC. | 828217-1-501396 | Parcel on Isla Colon, Bocas del Toro; was a foreclosed property | 8507-1001, 8401-1001 | 100 shares. | No. 1—one hundred shares in favor of Inmobiliaria Coral Sea, S. |
| 2 | LEASING & REAL ESTATE INVESTMENT CORP. | 758145-1-481848 | Company has a bank loan secured by properties in Coronado, owned by Inmobiliaria Lesser | N/A | 500 shares. | No. 1—five hundred bearer shares. |
| 3 | INMOBILIARIA LESSER, S.A. | 675299-1-463453 | owner of 11 parcels at Club de Golf Coronado secured by the Bank. | 133339 and 10 others | 100 shares. | No. 2—fifty shares in favor of Leasing & Real Estate Investment corp. |
| | | | | | | No. 3—fifty shares in favor of Par Cuatro (*illegible*) in process of replacement. |
| 4 | INMOBILIARIA GABON, S.A. | 831361-1-501962 | Owner of 30% of Inmobiliaria Hobart | N/A | 100 shares. | No. 1—one hundred shares in favor of Inmobiliaria Coral Sea, S. |
| 5 | INMOBILIARIA HOBART, S.A. | 831356-1-501961 | Fincas de Amador, Panama under the name of Inmobiliaria Hobart. These were foreclosed properties. | 183227-8720, 172605-8720 | 100 shares. | No. 1—thirty shares in favor of Inmobiliaria Gabón, S.A. |
| 6 | INVERSIONES PRISCO, S.A. | 2641045-1-839498 | Company with a 20% stake in the Municipality's parking project. | N/A | 500 shares. | No. 1—five hundred shares in favor of Inmobiliaria Coral (*illegible*) S.A. |

<u>ANNEX E</u>

**MILANO EXPORT COMPANY, INC.**

**List of Investments**

**DEPOSITS—balances as of January 31, 2015**

| Deposit No. | Bank | Capital Balance | Interest Balance | Rate | Start date | Maturity Date | Term in Months | Interest payment account |
|---|---|---|---|---|---|---|---|---|
| 10011058616 | Multibank | 8,654,098 | 180,935.85 | 4.1250% | 01-Aug-14 | 01-Aug-17 | 36 | Capitalization at maturity |
| 10011058665 | Multibank | 3,812,528 | 85,024.61 | 4.4000% | 01-Aug-14 | 01-Aug-17 | 36 | Capitalization at maturity |
| 10011058673 | Multibank | 3,210,000 | 71,587.40 | 4.4000% | 01-Aug-14 | 01-Aug-17 | 36 | Capitalization at maturity |
| 10011059655 | Multibank | 1,715,809 | 16,960.66 | 4.4000% | 12-Nov-14 | 12-Feb-15 | 3 | 10012162078 in the name of Alberto S. Btesh |
| 10011058681 | Multibank | 1,500,000 | 33,452.05 | 4.4000% | 01-Aug-14 | 01-Aug-17 | 36 | Capitalization at maturity |
| **TOTAL DEPOSITS** | | **18,892,436** | **387,960.57** | | | | | |

**INVESTMENT ACCOUNT—balances as of December 31, 2014**

| | |
|---|---|
| Account No. | MIL001 |
| Securities Brokerage Firm | Multi Securities |
| Fixed Income USD | 2,207,758.40 |
| Equities USD | 644,182.61 |
| **TOTAL INVESTMENT ACCOUNT** | **2,851,941.01** |

# FINAL ARBITRATION AWARD
# EXHIBIT D
# MEDICAL REPORTS
# CLEVELAND CLINIC
# DR. PITTI
# DR. DONDIS

 Cleveland Clinic

**Patient Name:**     **Alberto Salomon Bteche Hassan**
**Date of Birth:**     **January 22,1922**

### EXPERT MEDICAL TESTIMONY

It was the purpose of this report to review provided information and to give a professional opinion as to the ability of Mr Alberto Salomon Bteche Hassan to make informed and rational decisions based on his medical conditions. The scope of this opinion is limited to the information which has been provided.

### MEDICAL RECORDS

The following information was reviewed:

Medical records stemming from repeated hospitalizations at Hospital Punta Pacifica, between 2016 and 2019. This included, but was not limited to daily notes written by physicians; ER notes; radiographic reports including X-ray, ultrasound, echocardiogram, CT of brain and MRI of brain, and electroencephalogram (EEG). The imaging of the brain and the electroencephalogram were reviewed not only in report, but also the images themselves.

Pertinent parts will be reviewed below.

- Review of the records showed that Mr Bteshe had diabetes mellitus (type 2), atrial fibrillation, ischemic cerebrovascular disease, epilepsy, coronary insufficiency with anterolateral ischemic disease, severe cognitive impairment, encephalopathy, recurrent pneumonia secondary to aspiration, peripheral venous insufficiency, benign prostatic hyperplasia, and a previous history of colon cancer.

- The imaging studies of the brain demonstrated the following findings:
  Diffuse cerebral atrophy, most severe in right frontal and temporal areas
  Old lacunar infarctions (strokes) in the thalami

**Cleveland Clinic**

Diffuse ischemic cerebral disease of the small vessels

- EEG performed November 4, 2019. It demonstrated diffuse slowing in the 5-7 Hz range.

- Death certificate of Mr Bteche, dated December 17, 2019. Cause of death (as listed): cardiopulmonary arrest, pneumonia, and major cognitive impairment

- Review of the report by Dr Edisa Pitti, dated July 28, 2020

- Review of the report by Dr David Dondiso, dated Jul 27, 2020

- Review of his outpatient medications. This included (but was not limited to) Keppra (an anticonvulsant medication), duloxetine (an antidepressant), and aspirin (for the prevention of stroke and heart disease).

- Interview with Dr Edisa Pitti

- Interview with Jorge Calderon, the nurse of Mr Bteshe between 2016 – 2019. Of note, Mr Calderon stated that Mr Bteshe had issues with his memory and required assistance with activities of daily life. These issues progressed during the time of their acquaintance. Reference has been made to a physician visit, during which Mr Calderon and several family members were present, where it was mentioned that Mr Btesh had 'advanced senility' for several years. (The details of this visit and notes regarding it are not available for my review).

**INTERPRETATION**

After review of the above detailed records, it is fairly clear that Mr Bteshe suffered from Major Cognitive Impairment, most likely secondary to vascular disease. The details of this will be described below.

Major cognitive impairment, also known as dementia, is a blanket term that describes a state characterized most commonly by problems with memory, thinking, and reasoning. Common manifestations of this may include difficulties with reasoning, judgement, planning, inability to make decisions, trouble focusing on tasks, inability to recall the names of objects or people, struggling to perform daily tasks, or speaking or

**Cleveland Clinic**

behaving in ways that are not socially accepted. These issues are typically progressive and worsen over time. Difficulties with self care usually progress to the point where a person is totally dependent on others.

It may result from any number of conditions. These may include Alzheimer's disease, vascular dementia (secondary to stroke or to cerebrovascular insufficiency), Parkinson's disease, Lewy Body, traumatic brain injury, or other multiple less common causes. Dementia increases as an individual ages, such that 1-2 percent of people suffer from it by the age of 65, and as much as 30% of people by the age of 85. Given his risk factors, his advanced age, and the findings on the MRI, Mr Bteshe most likely had vascular dementia, for at least five, and possibly seven years, prior to his death.

According to an article from Stanford University, brain imaging findings (such as CT and MRI) typically demonstrate "evidence of brain atrophy, strokes and ischemia." All of which were seen in Mr Bteshe's MRI.

EEG slowing is extremely common in patients with dementia. Additionally, roughly 10% of patients with dementia will have seizures or epilepsy, compared to 1% of the general population. (It may be argued that the presence of epilepsy in the elderly may increase the rate of dementia by a factor of 10). As stated above, Mr Bteshe had epilepsy, most likely secondary to the vascular dementia.

Mood disorders such as depression occur in 30% of patients with vascular dementia. This is roughly six times higher than the 4.7% it occurs in people over the age of 50. It should be noted that Mr Bteshe was taking the medication, duloxetine, a well known antidepressant medication.

According to an article from European Journal of Neurology in 2009, pneumonia and cardiac ischemia are the most common causes of death in someone with vascular dementia. Both of these diagnoses were listed on the death certificate.

Regarding life expectancy from the time of diagnosis, it should also be noted that the average life expectancy for people with vascular dementia live approximately five years from the time of diagnosis.

A last point to consider is that people with dementia become progressively dependent on others. The physical dependence manifests itself as people become increasingly unable to care for themselves -- difficulty with dressing, bathing, eating, toileting, and other factors. In addition, as their ability to communicate may be impaired, as is their judgement, they also become increasingly dependent on others psychologically. Both of these, may lead to issues of elder abuse. According to the National Council on Aging, this may include physical abuse, sexual abuse, emotional abuse, confinement, passive neglect, willful deprivation, and financial exploitation.

**Cleveland Clinic**

Financial exploitation is actually the second most common and occurs in roughly 5% of patients with dementia. Famous cases of financial exploitation in patients include the author Harper Lee, actors Peter Falk, Casey Kasem, Tim Conway, and singer BB King.

Perhaps the most infamous case, however, involved former socialite Brooke Astor (of the famed Waldorf-Astoria hotel family). In 2009, her son Anthony Marshall was convicted on 14 criminal counts (including fraud and grand larceny) for tricking his mother out of tens of millions of dollars, and changing her will while suffering from dementia in her final years. Indeed, the co-defendant, Francis Morrisey, Astor's estate lawyer, was found guilty on all six counts of conspiracy, scheming to defraud and forgery.

This financial exploitation is not limited to the wealthy. Indeed, it is estimated that seniors and people with dementia are victims in the amount of roughly 36.5 billion dollars annually.

SUMMARY

Based on the review of the records and the interviews, Mr Bteshe had major cognitive decline, most likely stemming from vascular dementia. The depression and epilepsy are consistent with this. This is further supported by the imaging and EEG findings. Given that the average lifespan of someone with vascular dementia is 5 years, one may consider that was the period it may have lasted from 5 to 7 years until the date of death. This is further corroborated by the information from the interview with Mr Calderon dating back two years. More likely than not, based on the above information, his reason, judgement, memory, and other cognitive functions may have been affected during this time.

Damon Salzman, MD          9/21/2020
Diplomate of the American Board of Psychiatry and Neurology
Director of the Lou Ruvo Center for Brain Health
Cleveland Clinic, Florida.



**Lingua Franca Translations**

3390 Mary Street, Suite 116
Coconut Grove, FL 33133
Phone: 786.762.3049
E-mail: info@lftranslations.com

August 12, 2020

### CERTIFICATE OF TRANSLATION

Spanish > English Translation:

- Clinical File for Mr. ALBERTO SALOMÓN BTECHE HASSAN (DECEASED)

I, Diana M. Arbeláez, with the ATA nr. 251348 at Lingua Franca Translations do hereby certify that the translation herein was completed in accordance with the American Translators Association Code of Professional Conduct and Business Practices and that to the best of my knowledge the translation into English herein provided is, in fact, a literal and true interpretation of the statements in the original language Spanish.

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Diana Marcela Arbelaez

State of Florida
County of Miami-Dade

# CONSULTORIOS MÉDICOS BELLA VISTA
# [BELLA VISTA MEDICAL CONSULTANTS]

## DR. EDISA PITTI

### PSYCHIATRY

AVE PERÚ CONSULTORIO 305 3er PISO
TEL 225-8593/FAX 227-4605 CEL 6614-7619
Email : draedisapitti@gmail.com

**Panama,  July 28, 2020**

**EXPERT REPORT**

At the request of the interested party, the evaluation of the Clinical File for **Mr. ALBERTO SALOMÓN BTECHE HASSAN** (RIP), bearer of personal identity card **# 8-86-99**, has been conducted.

This report was prepared using the Clinical History collected in the Clinical Record of Hospitalizations at Hospital Punta Pacifica (2016-2019), as well as the Neuroimaging and Neurophysiological Studies conducted during said hospitalizations, the Report by the Neurologist that treated Mr. ALBERTO SALOMON BTECHE HASSAN (RIP) during one of his hospitalizations, and The International Classification of Mental Illnesses ICD 10 of the World Health Organization WHO.

## 1- IDENTIFICATION DATA

Name: Alberto Salomón Bteche Hassan (RIP)
Age: 97 years of age
I.D. Card: 8-86-99
Religion: Jewish
Date of Birth: January 22, 1922
Date of Death: December 17, 2019

## II.  SUMMARY OF THE CLINICAL RECORD OF THE HOSPITALIZATIONS AT THE PUNTA PACÍFICA HOSPITAL  (December 2016-2019):

- According to the record, this is a 97-year-old male, with a history of Arterial Hypertension, Type 2 Diabetes Mellitus, Atrial Fibrillation, Ischemic Cerebrovascular Disease, Convulsive Episodes, Coronary Insufficiency with Anterolateral Ischemic Lesion, Severe Cognitive Impairment, Encephalopathy superimposed on Cognitive Impairment, Recurrent Pneumonia due to Aspiration, [end of text in source]

Peripheral Venous Insufficiency, Benign Prostatic Hyperplasia and Colon Cancer Surgery.

- **Mr. ALBERTO SALOMÓN BTECHE HASSAN (RIP),** was hospitalized at the Punta Pacifica Hospital, on multiple occasions (7 hospitalizations from 2016 to December 2019), for Aspiration Pneumonia, Ischemic Cerebrovascular Disease, Convulsive Episodes, Atrial Fibrillation and Arterial hypertension. The Clinical History of these hospitalizations, states that the patient presented disorientation in place and time, with neurological deterioration characterized by periods of intermittent disconnections, which were increasing until he presented a clonic seizure episode in all 4 extremities, which was preceded by a moment of disconnection and loss of consciousness, with a sustained upward gaze, with recovery of consciousness after the seizure. He presented focal neurological signs such as: Disorientation in place and time, as well as a significant decrease in strength in his four lower extremities [sic], absence of stretch reflex in the four lower extremities [sic]. and decreased sensation in the right foot. Associated with this, it is found that the patient presented episodes of psychomotor agitation, sleep pattern disturbances, swallowing dysfunction, episodes of confusion, as well as periods of absence and lack of verbal response, associated with clonic movements and sphincter relaxation. The record indicates that the patient was dependent on his caregiver for Activities of Daily Living and walked with a walker.

- On the Death Certificate of **MR. ALBERTO SALOMÓN BTECHE HASSAN** (RIP) The following diagnoses appear:
    - **CARDIORRESPIRATORY ARREST**
    - **PNEUMONIA**
    - **MAJOR COGNITIVE IMPAIRMENT**
- In the International Classification of Diseases, Major Cognitive Impairment is the term used to refer to DEMENTIA.

III. <u>FINDINGS OF NEUROIMAGING AND ELECTROENCEPHALOGRAM STUDIES:</u>

During the hospitalizations, Neuroimaging studies such as BRAIN CT, BRAIN MRI, and ELECTROENCEPHALOGRAM were performed, which show the following findings:

I. In the BRAIN TOMOGRAPH carried out on November 3, 2019, there were no signs of intracranial hemorrhage, but it did show signs suggesting Bilateral and Supratentorial hypodense lesions in the Cerebellar Hemispheres and MARKED CEREBRAL ATROPHY, which were already seen in the previous BRAIN MRI study performed on June 22, 2019.

2. On June 22, 2019, he underwent a BRAIN MAGNETIC RESONANCE, due to the episodes of transient cerebral ischemia that he presented and in it, the **CORTICAL AND SUBCORTICAL LESIONS** with greater involvement of the right side, including discrete affections in thalamic regions, are evidenced and at the level of the Brainstem Bridge, which indicates the presence of an **ISCHEMIC CEREBRAL DISEASE OF SMALL VESSELS AND PREDOMINARY FRONTOTEMPORAL CEREBRAL ATROPHY IN RIGHT TEMPORAL LOBES**. These brain injuries are considered multiple ischemic injuries associated with arteriosclerosis and others caused by micro-embolisms that are frequent in people suffering from cardiac arrhythmias such as **CHRONIC ATRIAL FIBRILLATION** presented by Mr. ALBERTO SALOMÓN BTECHE HASSAN (RIP). The neurologic compromise that the patient evidenced, as well as the degree of severity of vascular lesions and marked **BRAIN ATROPHY**, indicate that these lesions were present and had a minimum evolution of about 5 years.

3. An Electroencephalogram was performed on November 4, 2019 that showed an ABNORMAL RHYTHM characterized by basic electrical rhythm in the range of 5-7 Hertz (Delta-Alpha) symmetric and bilateral Synchronous, without epileptic activity during the recording, but it should be noted that the patient was on antiepileptic drugs, thereby inhibiting the epileptic activity that he had presented the day before, wherein the patient presented a generalized tonic-clonic seizure episode, preceded by an episode of disconnection and loss of consciousness with upward gaze deviation. Due to the history of cerebral ischemic lesions with cortical involvement, it was considered that the probability of continuing to have epileptic seizures was high, so treatment with antiepileptic drugs (Levetiracetam) was started by nasogastric tube 2.5 ml (250mg) every 12 hours, so this explains the absence of epileptiform activity on the Electroencephalogram. However, he had **SLOW ELECTRICAL BRAIN ACTIVITY** (symmetrical Delta) which has been documented in states of Encephalopathy, depression, and DEMENTIA.

## IV.   NEUROLOGICAL CERTIFICATION:

In certification carried out by the Neurologist who attended **MR. ALBERTO SALOMÓN BTECHE HASSAN** (RIP), during the hospitalization of November 3, 2019 in the PUNTA PACÍFICA Hospital room, after evaluating the cynical history of the patient, the neurological examination as well as the neuroimaging and neurophysiological studies, CAT BRAIN TOMOGRAPHY performed on November 3, 2019, BRAIN MAGNETIC RESONANCE PERFORMED on June 22, 2019 and the ELECTROENCEPHALOGRAM performed on November 4, 2019 concludes that the patient had the following diagnoses:

1. **FOCAL EPILEPSY WITH SECONDARY GENERALIZATION ASSOCIATED WITH CEREBRAL ISCHEMIAS**
2. **SMALL VESSEL  CEREBROVASCULAR DISEASE**

3. **CARDIOEMBOLIC CEREBRAL ISCHEMIAS DUE TO CHRONIC ATRIAL FIBRILLATION**
4. **ADVANCED STAGE VASCULAR DEMENTIA**

## V.   CLINICAL CONSIDERATIONS:

- Vascular Dementia is one of the most common causes of Cognitive Impairment in Adulthood; the incidence increases exponentially as age advances.
- Vascular Dementia is the loss of Intellectual Function or Cognitive Impairment secondary to the destruction of the Brain Tissue by Brain Injuries caused by the reduction or blockage of the blood supply either by hemorrhages or cerebral infarcts, as occurs in Cerebrovascular Disease.
- The etiopathogenic mechanisms in Vascular Dementia most commonly involved are Hemorrhagic lesions, Cerebral Infarcts (Cortical or Subcortical), which can be Single, (located in strategic areas) or Multiple, which are generally silent and their effect is cumulative, and Small Vessel Disease. A prevalence of Vascular Dementia, up to 9 times higher, has been documented in patients who have Multiple Cerebral Infarcts.
- Vascular Dementia often occurs in patients with risk factors such as:
  a. Arterial hypertension
  b. Cerebrovascular disease
  c. Small Vessel Disease
  d. Atrial Fibrillation
- Focal Neurological Signs such as gait disturbances, weakness or decreased strength in the extremities, pseudobulbar signs, such as weakness of the muscles of the tongue and pharynx, associated with dysphagia (patients require feeding by Probe nasogastric). As well as the presence of Seizure Episodes, they are some of the neurological signs present in these patients.
- • In cases of Vascular Dementia, the Impairment of Superior Brain Functions or Executive Functions, (Orientation, Memory, Attention, Concentration, Planning and Execution Capacity, Judgment of Reasoning and Reality), usually appears from the initial stages of the disease, as well as loss of Autonomy and commitment to the Global Functioning of the individual, until reaching total dependence for the Activities of Daily Living, in the advanced stages of Dementia.

## VI.   CONCLUSIONS

- From the data obtained from the Clinical File of Mr. ALBERTO SALOMÓN BTECHE HASSAN (RIP), we can point out that he was a 97-year-old male, with multiple long-standing comorbidities already mentioned in the paragraphs above.

- These comorbidities, such as Arterial Hypertension, Chronic Atrial Fibrillation, and Small Vessel Disease, acted as a predisposing factors for the development of multiple ischemic cerebral lesions, associated with arteriosclerosis and others produced by microembolisms that are frequent in people who suffer from cardiac arrhythmias, such as Chronic Atrial Fibrillation, which Mr. Bteche experienced. In Neuroimaging Studies, multiple cortical and subcortical ischemic lesions are evidenced with greater affection on the right side, including discrete affections of the thalamic regions and at the level of the bridging of the brainstem, which evidences the presence of SMALL VESSEL ISCHEMIC BRAIN DISEASE, as well as SEVERE FRONTOTEMPORAL CEREBRAL ATROPHY, predominantly in the right temporal lobes.

- The findings of the completed Neurological evaluation, wherein a Significant Neurological Compromise is evidenced, with the presence of focal neurological signs and evidence of Seizure Episodes, as well as the Neuroimaging Studies and the Electroencephalogram, conclude that he has ADVANCED DEMENTIAL VASCULAR SYNDROME, SMALL VESSELS CEREBROVASCULAR DISEASE, as well as FOCAL EPILEPSY WITH SECONDARY GENERALIZATION associated with Cerebral ischemias, due to arterioscleorysis and microemboli due to CHRONIC VENTRICULAR FIBRILLATION.

- The degree of neurological compromise shown in the patient, as well as the severity of the Cerebral Vascular Lesions and the marked Cerebral Atrophy, indicate a minimum evolution of about 5 years.

- Taking into account the findings of the clinical file, the death certificate, the neurological evaluation as well as the neuroimaging exams and the Electroencephalogram, we can conclude that the MR. ALBERTO SALOMON BTECHE HASSAN (RIP) presented the following diagnoses:

    1. **ADVANCED VASCULAR DEMENTIA.**
    2. **CEREBROVASCULAR DISEASE OF SMALL VESSELS**
    3. **CARDIOEMBOLIC CEREBRAL ISCHEMIA DUE TO CHRONIC ATRIAL FIBRILLATION**
    4. **FOCAL EPILEPSY WITH GENERALIZATION ASSOCIATED WITH CEREBRAL ISCHEMIAS**
    5. **CHRONIC ATRIAL FIBRILLATION**
    6. **HT [Hypertension]**
    7. **TYPE 2 DIABETES MELLITUS**
    8. **CORONARY INSUFFICIENCY WITH ANTEROLATERAL ISCHEMIC INJURY**
    9. **ENCEPHALOPATHY, PROBABLY ANOXO ISCHEMIC**
    10. **BRONCHASPIRATION PNEUMONIA**
    11. **PERIPHERAL VENOUS INSUFFICIENCY**
    12. **BENIGN PROSTATIC HYPERPLASIA**
    13. **COLON CANCER SURGERY**

- The Diagnosis of ADVANCED VASCULAR DEMENTIA implies a significant compromise of Global functioning, with total dependence for Activities of Daily Living, as well as the Compromise or Loss of Higher Cognitive Functions and Reality Judgment, which affects the Self-control and self-governance abilities of patients suffering from said disease.

**SINCERELY,**

**ORA EDISA PITTI**
**Psychiatrist**
**Reg. # 3587**



# DR. DAVID R. DONDISO
## Neurology – Internal Medicine
E-mail: ddondis@yahoo.com

Panama, July 27, 2020

## CERTIFICATION

1. The undersigned physician states that he attended Mr. Alberto Salornón Bteche Hazzan, bearer of identity card 8-86-99, on November 3, 2019 (aged 97) in a room at the Punta Pacifica Hospital, where he was treated for respiratory symptoms of cough with phlegm, and dehydration. Previously, he had neurological deterioration characterized by periods of intermittent disconnections, with moments of occasional disorientation, but which were very frequent on the day of the evaluation, presenting a clonic seizure episode in all 4 limbs, preceded by a moment of disconnection and loss of consciousness with sustained upward deviation of the eyes. He regained consciousness after the seizure event. The patient had a nasogastric tube and during the neurological examination he was awake and oriented in person, but not in time or place. He was able to answer simple questions and follow directions during the neurological exam. Examination of the eyes revealed asymmetry of pupil size from previous surgeries to both eyes. There was no difficulty in articulating words (dysarthria) or paralysis of the face or eye movements or the tongue, or the extremities, but the decrease in strength in his lower extremities was noticeable (+3/5) compared to the upper ones (4/5). Muscle stretch reflexes in his 4 limbs were absent, and sensation in the sole of the right foot was greatly diminished (insensitive) compared to the left (probably due to underlying sensory neuropathy or neurological sequelae of previous cerebral ischemia). Before being admitted, he walked with a walker.

*Patient: Alberto Salomon Bteche Hazzan*

2

In the simple Cerebral Tomograph performed (November 3, 2019) there were no signs of intracranial hemorrhage, but signs suggesting hypodense lesions were observed bilaterally in the cerebellar hemispheres; and supratentorially, with multiple hypodense cortical and subcortical bilateral lesions and cerebral atrophy. Already in a previous brain MRI study on June 22, 2019, carried out for episodes of transient cerebral ischemia, cortical and subcortical lesions were seen, with greater involvement of the right side, including discrete conditions in thalamic regions and at the level of the bridge of the brain stem (Chemic small vessels brain disease) and frontotemporal cerebral atrophy predominantly in temporal lobes, also predominantly on the right. His brain lesions are considered ischemic lesions due to arteriosclerosis and others due to micro embolisms that are frequent in people who have cardiac arrhythmias such as chronic atrial fibrillation (the patient was already receiving the oral anticoagulant  Apixaban 5mg twice a day). These cerebral vascular lesions could be considered to have been present for at least 5 years of evolution.

It was considered that, due to the presence of these cerebral ischemic lesions with cortical involvement, the probability of continuing to present epileptic seizures was high, for which an antiepileptic drug (Levetiracetam) would be started by nasogastric tube 2.5 mL (250 mg) every 12 hours, and an Electroencephalogram (EEG) scheduled.

An EEG was performed on November 4, 2019 that showed an abnormal rhythm characterized by basal rhythm electrical activity in the range of 5-7 Hertz (delta - alpha) symmetric and synchronous bilateral, without epileptic activity during recording. The patient was already on a dose of antiepileptic therapy, which could minimize or inhibit the epileptic activity that would have caused the seizure of the previous day. The presence of slow brain electrical activity (symmetric delta) has been documented in states of drowsiness, depression, encephalopathy, and dementia.

*Patient: Alberto Salomon Bteche Hazzan*

3

Summary. Mr. Alberto Bteche appeared to have intermittent neurological deterioration (disconnections, disorientations) that were more frequent on the day of the generalized clonic seizure. The brain imaging studies detected lesions that lead to two types of brain circulatory problems: small cerebral vessel disease due to arteriosclerosis and embolic problems related to a history of atrial fibrillation for which he was under treatment. The EEG showed an abnormal baseline electrical rhythm that can be seen in some conditions such as drowsiness, depression, encephalopathy, and dementia. It was recommended an antiepileptic be added to reduce the risk of focal and generalized seizures.

Diagnoses:

1. Focal epilepsy with secondary generalization, associated with cerebral ischemia.
2. Small vessel cerebrovascular disease.
3. Cardioembolic cerebral ischemias due to chronic atrial fibrillation.
4. Advanced State vascular dementia

Sincerely,

*Dr. David R. Dondis C.*
Neurology – Internal Medicine
Reg. # 4970  Cod. D-063

[illegible signature]

**Dr. David R. Dondis C., FACP**
Neurology – Internal Medicine
Pacífica Salud - Hospital Punta Pacífica, 5to piso. Oficina 505
Complejo Hospitalario Dr. Arnulfo Arias Madrid – CSS
Telephones: (507) 6612-4691, (507) 204-8315
ddondis@yahoo.com

*Patient: Alberto Salomón Bteche Hazzan*

# FINAL ARBITRATION AWARD
# EXHIBIT E
# HOUSEKEEPER AFFIDAVIT



The Spanish Group LLC
1 Park Plaza, Suite 600
Irvine, CA 92614
United States of America
https://www.thespanishgroup.org

## Certified Translation

Furnished on the **23rd** day of **May, 2023**

     I, Alexander Largaespada (*Alex Largaespada*), hereby certify that I translated the attached document from Spanish into English or English into Spanish and that this translation is an accurate and faithful translation of the original document. Furthermore, I certify that I am proficient in translating both Spanish and English and that I hold the capacity to render and certify the validity of such a translation. This document has not been translated for a family member, friend, or business associate.

     I, Salvador G. Ordorica, as a Quality Assurance Agent of The Spanish Group LLC, hereby attest that the aforementioned translator is a proficient Spanish-English translator. Accordingly, as an authorized representative of The Spanish Group, I certify that this document has been proofread and that the attached document is a faithful and authentic translation of its original.

Respectfully,



**Salvador G. Ordorica**

**The Spanish Group LLC**

**(ATA #267262)**

*The Spanish Group LLC verifies the credentials and/or competency of its translators and the present certification, as well as any attached pages, serves to affirm that the document(s) enumerated above has/have been translated as accurately as possible from its/their original(s). The Spanish Group LLC does not attest that the original document(s) is/are accurate, legitimate, or has/have not been falsified. Through having accepted the terms and conditions set forth in order to contract The Spanish Group LLC's services, and/or through presenting this certificate, the client releases, waives, discharges and relinquishes the right to present any legal claim(s) against The Spanish Group LLC. Consequently, The Spanish Group LLC cannot be held liable for any loss or damage suffered by the Client(s) or any other party either during, after, or arising from the use of The Spanish Group LLC's services.*

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California

County of _____**ORANGE**_____ .


On , __**May 23rd, 2023**__ before me, _____**NICOLE A. RENNA NOTARY PUBLIC.**_____

(insert name and title of the officer)

personally appeared _____**Salvador G. Ordorica**_____,
who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed
to the within instrument and acknowledged to me that he executed the same in his authorized
capacity, and that by his signature on the instrument the person, or the entity upon behalf of which
the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

NICOLE A. RENNA
COMMISSION # 2302767
Notary Public - California
ORANGE COUNTY
My Comm. Expires Aug. 24, 2023

Signature _____          **(Notary Public Seal)**

## SWORN STATEMENT

I, ROSANGEL RIVERO GUERRERO, female, Colombian, of legal age, with Colombian passport No. AV765987, with address at Calle 24 de Diciembre, Altos de Tocumen, next to La Dona Shopping Center, Posada market, in Tocumen Township, and I declare under penalty of perjury that everything that I am going to state is true since I witnessed it and heard it, by this statement, that I have worked with Mr. ALBERTO BETESH senior, at his residence located on Ave. Ricardo Arengo, calle 55 Este, casa No. 15. next to the Indonesian Embassy, in Panama City, for a period of nine (9) months, first as a cook and then helping him with his personal hygiene, since he was an elderly man, and could not fend for himself, Mr. JORGE also worked with me, who was almost his nurse, his driver and was in charge of taking and bringing what Mr. ALBERTO needed, in the last months I worked with Mr. BETESH father, he no longer spoke, nor did he understand what was said to him, he did not want to take his medications, he did not even want to watch television. Mr. BETESH father had two (2) daughters and two sons, one of whom lives in Panama. On two occasions, his son ISAAC appeared at Mr. ALBERTO's house, accompanied by three (3) men who were carrying some papers and went to talk with Mr. BETESH father, we do not know what was said in the meeting because they locked themselves, Mr. JORGE told me that they seemed to be lawyers because of the way they expressed themselves. On the second visit, we confirmed that the gentlemen were lawyers because when they finished the meeting, Mr. ISAAC was happy saying that the bank had been sold and that they were going to make a gift to Mr. JORGE and to myself, and I understand that a few months later said sale took place, but the second time they returned Mr. ALBERTO BETESH (RIP) no longer spoke, he did not recognize anyone, neither me nor Mr. JORGE, who were those that were helping him, we gave him his food, his medicine, we helped him with his personal hygiene, and we took care of him day and night. As I stated, MR. ALBERTO no longer recognized any of us, not even his children, who would pick him up on Fridays to take him to dinner on what they call Shabbat.

On one occasion Mr. ISAAC appeared with two Rabbis, and Mr. ALBERTO did not recognize them.

Once again I want to state in this short summary that I do not know the names of the lawyers who went to Mr. BETESH's house together with ISAAC, but what I can state is that in the last few months Mr. ALBERTO BETESH (RIP) no longer spoke, he did not recognize anyone, not even Mr. Jorge or me, who worked for him, nor his children, he did not understand what was being said to him, he did not have to take his medications, or watch television, I worked for Mr. ALBERTO BETESH (RIP) until the day he passed away.

I attest of the stated, on [Illegible].

[Signature]
ROSANGEL RIVERO GUERRERO
Passport No. AV765987

[Seal: Republic of Panama. Second Notary of the Circle]

CERTIFICO:

[Seal: the [Illegible] of the Circle of Panama, with Citizenship Card No. 8-421-593. CERTIFIES that the prior signature has been recognized as true by the signatory, therefore, it is authentic. Panama, May 16, 2023, Witness [Signature] Witness, [Signature], [Signature] Lawyer Fabian E. Ruiz S. Second Notary Public]

# FINAL ARBITRATION AWARD
# EXHIBIT E
# NURSE AFFIDAVIT



The Spanish Group LLC
1 Park Plaza, Suite 600
Irvine, CA 92614
United States of America
https://www.thespanishgroup.org

## Certified Translation

Furnished on the **2nd** day of **May, 2023**

I, Alexander Largaespada (*signature*), hereby certify that I translated the attached document from Spanish into English or English into Spanish and that this translation is an accurate and faithful translation of the original document. Furthermore, I certify that I am proficient in translating both Spanish and English and that I hold the capacity to render and certify the validity of such a translation. This document has not been translated for a family member, friend, or business associate.

I, Salvador G. Ordorica, as a Quality Assurance Agent of The Spanish Group LLC, hereby attest that the aforementioned translator is a proficient Spanish-English translator. Accordingly, as an authorized representative of The Spanish Group, I certify that this document has been proofread and that the attached document is a faithful and authentic translation of its original.

Respectfully,



**Salvador G. Ordorica**
**The Spanish Group LLC**
**(ATA #267262)**

The Spanish Group LLC verifies the credentials and/or competency of its translators and the present certification, as well as any attached pages, serves to affirm that the document(s) enumerated above has/have been translated as accurately as possible from its/their original(s). The Spanish Group LLC does not attest that the original document(s) is are accurate, legitimate, or has/have not been falsified. Through having accepted the terms and conditions set forth in order to contract The Spanish Group LLC's services, and/or through presenting this certificate, the client releases, waives, discharges and relinquishes the right to present any legal claim(s) against The Spanish Group LLC. Consequently, The Spanish Group LLC cannot be held liable for any loss or damage suffered by the Client(s) or any other party either during, after, or arising from the use of The Spanish Group LLC's services.

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____**ORANGE**_____.

On , **May  2nd, 2023**_____ before me, _____**NICOLE A. RENNA NOTARY PUBLIC.**_____
(insert name and title of the officer)

personally appeared _____**Salvador G. Ordorica**_____,
who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

NICOLE A. RENNA
COMMISSION # 2302767
Notary Public - California
ORANGE COUNTY
My Comm. Expires Aug. 24, 2023

Signature _____          **(Notary Public Seal)**

To Whom It May Concern:

My name is Jorge Calderon Ludena, and I am a licensed professional nurse since 1998, holding a Bachelor of Science in Nursing degree from Inca Garcilaso de la Vega University in LIMA-PERU. I'm registered with the Lima city nursing board.

In January 2016, I started working for Mr. Alberto Btesh, providing him with 24-hour health care services throughout the week, with one day off. As part of my duties, I was responsible for his personal care and providing him with quality health care. Additionally, I accompanied him to all his medical appointments and treatments.

Mr. Alberto Btesh exhibited a marked state of dependence as he required constant assistance in dressing, walking, and performing his physiological needs, among others. I observed a progressive deterioration in both his cognitive and physical abilities.

And in the last year, there was a notable change in his health status. As a result, he had to take medications such as Rivotril and Kepra to alleviate his symptoms, but at the same time, he was limited in performing his daily activities.

I attest to the accuracy of these facts based on the services I provided.


Sincerely,


[Signature: J Calderon]



# FINAL ARBITRATION AWARD
# EXHIBIT G
# DEATH CERTIFICATE
# MR. ALBERTO BTESH RIP

REPÚBLICA DE PANAMÁ
TRIBUNAL ELECTORAL
DIRECCIÓN NACIONAL DEL REGISTRO CIVIL
FORMULARIO ÚNICO DE PARTE CLÍNICO DE DEFUNCIÓN

Núm. 211692

Alberto   Salomon   Bleche   Harzan

B - 86 - 99

Panameña

Jubilado

02 - 19 38

25  Enero   1933

17  Diciembre   2019

Salomon Bleche   Rachell Harzan

Panama   Bella Vista   Calle 55  Obarrio  Casa 6

Panama   Bella Vista   Calle 55  Obarrio  Casa 6

Paro cardiorespiratorio
Neumonia
Deterioro Cognitivo Mayor

6  diciembre  2019      17  diciembre  2019

Melchor Rivera M  6-707-1(2).

geriatra

DR. MELCHOR RIVERA MADRID
GERIATRA
REG-7698

17/ diciembre/ 2019